**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 2 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JEFFREY TODD PIERCE,

   Plaintiff-Appellee,

  v.

JOYCE GILCHRIST and ROBERT H.
MACY,

   Defendants-Appellants.

No. 02-6241, 02-6351

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CIV-02-509-C)**

Submitted on the briefs:    *

Melvin C. Hall, Riggs, Abney, Neal, Turpen, Oribson & Lewis, Oklahoma City,
Oklahoma, for Defendant-Appellant Joyce Gilchrist.

John M. Jacobsen, First Assistant District Attorney, Oklahoma City, Oklahoma,
for Defendant-Appellant Robert H. Macy.

Clark O. Brewster and Guy A. Fortney, Brewster & DeAngelis, Tulsa, Oklahoma,
for Plaintiff-Appellee Jeffrey Pierce.

---

  *After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. See Fed. R. App. P. 34(f). The case is therefore submitted without
oral argument.

Before **McCONNELL** , Circuit Judge,  **BRORBY** , Senior Circuit Judge, and **TYMKOVICH** , Circuit Judge.

**McCONNELL** , Circuit Judge.

Plaintiff Jeffrey Pierce spent fifteen years in Oklahoma state prison for a rape he did not commit.  Because DNA analysis demonstrated that Pierce could not have been the source of the semen found on the rape victim, his conviction was vacated on May 7, 2001, and he was released from prison.  Mr. Pierce now seeks compensatory and punitive damages from the system and individual actors who deprived him of fifteen years of his life.

The gravamen of Mr. Pierce's complaint is that Ms. Joyce Gilchrist, a forensic chemist for the Oklahoma City Police Department ("OCPD"), fabricated inculpatory evidence and disregarded exculpatory evidence, which led prosecutors to indict and prosecute Mr. Pierce for the rape.  He further alleges that Oklahoma City District Attorney Robert Macy fostered an environment within his office wherein questionable prosecutorial tactics, including reliance on unfounded forensic analysis, were routinely used to secure convictions.  Mr. Pierce claims that working in concert, Ms. Gilchrist and Mr. Macy engaged in a pervasive pattern of railroading defendants through the Oklahoma courts and into extended prison sentences.  While this system may have provided the citizens of Oklahoma

2

with a false sense of efficient justice, if the allegations are correct, it deprived criminal defendants of basic constitutional rights and led to at least one unwarranted conviction.

This case reaches us at the motion to dismiss stage, and we thus recite the facts largely as detailed by Plaintiff Pierce in his complaint before the district court and his filings before this Court. Although Mr. Pierce has named other governmental units as defendants in this action, only Defendants Gilchrist and Macy filed motions to dismiss before the district court. For this reason, our recitation of the facts, as well as our holding, are limited to the facts and legal issues bearing on the claims against Defendants Gilchrist and Macy.

Because Defendants raise only issues of law in connection with their appeal of the district court's denial of qualified immunity, this Court has appellate jurisdiction. *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000).

## I. Factual Background

### A. *The Rape and Mr. Pierce's Conviction*

The events leading to this troubling case began on May 8, 1985, with the rape of Ms. Sandra Burton, a resident of the Woodlake Apartment Complex in Oklahoma City, Oklahoma. Mr. Pierce was employed as a landscaper at the Woodlake complex. [Compl. 5, App. 60.] He was 25 years old, married, with twin boys on the way. While police were still on the scene, Mr. Pierce was taken

3

by police to be viewed by the victim. At that time, Ms. Burton stated that Mr. Pierce was not the rapist. Two witnesses testified that he was elsewhere at the time of the rape.

In March of 1986, pursuant to an arrest warrant not challenged in this action, Mr. Pierce was arrested and taken into custody. The arrest warrant was supported by an affidavit filed by an OCPD officer stating that Ms. Burton had positively identified Mr. Pierce as the rapist from a photographic lineup. Once in custody, Mr. Pierce waived objections to a search of his body, and police collected body fluids and head and pubic hairs from his person. As a condition to the waiver, OCPD officers told Mr. Pierce that if the hairs did not match he would be released. Five minutes later, Mr. Pierce was told that a forensic chemist had matched his hairs to evidence collected from the Woodlake rape scene.

The forensic analysis was performed by Defendant Joyce Gilchrist. Ms. Gilchrist's forensic analysis identified a total of 33 scalp and pubic hair samples from the crime scene as "microscopically consistent" with evidence taken from Mr. Pierce's body, thus concluding that the hairs could have come from Mr. Pierce. According to Mr. Pierce's amended complaint, those findings were false and without any scientific basis. Further, Mr. Pierce alleges that, with knowledge and deceit, Ms. Gilchrist (i) concealed the fact that Mr. Pierce's hair did not match the hairs found at the crime scene, (ii) violated the district court's order to

4

deliver the hair samples in a timely manner for review by Mr. Pierce's forensic expert, and (iii) disregarded her own findings that Mr. Pierce's blood contained a particular enzyme, PGM-2-1, which conclusively precluded Mr. Pierce from being the source of the sperm found on the victim.

Thereafter, Mr. Pierce was charged with first degree rape, oral sodomy, second degree burglary, and assault with a dangerous weapon. Mr. Pierce alleges that Ms. Gilchrist's fraudulent oral and written reports "became an inseparable basis" upon which the district attorney filed these charges. At trial, Mr. Pierce was found guilty and sentenced to 65 years in prison.

In April of 2001, the FBI released a report authored by Special Agent Deedrick reviewing the forensic work performed by Ms. Gilchrist between 1982 and 1991. The report examined Ms. Gilchrist's work in eight investigations, including that of Mr. Pierce. Special Agent Deedrick found that at least five of the cases involved contrived and erroneous statements by Ms. Gilchrist regarding identification of persons, and that Ms. Gilchrist repeatedly made statements beyond the limits of forensic science. With regard to Mr. Pierce's case specifically, Special Agent Deedrick concluded that none of the hairs taken from Plaintiff's body exhibited the same microscopic characteristics as those found at the crime scene.

Speculation regarding Ms. Gilchrist's work apparently prompted the OCPD

5

to send evidence from the *Pierce* case to the Serological Research Institute (SERI) in Richmond, California, for DNA testing. On May 7, 2001, the OCPD laboratory received a final report from SERI exonerating Mr. Pierce on the basis of its DNA analysis. On the same day, the district court for Oklahoma County ordered Mr. Pierce's conviction and sentence "vacated, set aside and held for naught because Petitioner Pierce is factually innocent of committing the crimes for which he was charged and convicted."

B.    *Defendant Gilchrist*

Beyond the facts immediately connected to his prosecution, Mr. Pierce alleges that Ms. Gilchrist's and Mr. Macy's behavior reflects a pattern and practice of the OCPD and the district attorney's office in securing convictions on the basis of falsified or misleading evidence. Mr. Pierce points out that Ms. Gilchrist's forensic analysis and testimony has been subject to numerous reprimands by the Oklahoma courts. For example, in *McCarty v. State*, 765 P.2d 1215, 1222 (Okla. Crim. App. 1988), the Oklahoma Court of Criminal Appeals ("OCCA"), Oklahoma's court of last resort for criminal cases, reversed a death-penalty conviction secured on the basis of Ms. Gilchrist's testimony. The OCCA found that Ms. Gilchrist improperly delayed sending her report as well as the raw data to the defense's expert witness for independent examination. *Id*. at 1217. Further, the OCCA found that at multiple points during the trial, Ms. Gilchrist

6

testified beyond her professional expertise and beyond the state of the art of forensic science. *Id*. at 1218-20.

The OCCA reprimanded Ms. Gilchrist on at least one other occasion for testifying to an opinion regarding the defendant's physical contact with the victim that was not supported by scientific evidence. *See Fox v. State*, 779 P.2d 562, 571-72 (Okla. Crim. App. 1989). Similarly, in *Miller v. State*, 809 P.2d 1317, 1319-20 (Okla. Crim. App. 1991), the OCCA granted the defendant, on trial for rape and sodomy charges, a new trial because Ms. Gilchrist failed to provide the defense expert with her report and evidence in a timely manner.

More recently, this Court had occasion to assess the reliability of Ms. Gilchrist's forensic analysis. In *Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir. 2001), we reviewed defendant Mitchell's Oklahoma state convictions on a petition for habeas corpus. Mitchell was sentenced to death on charges of premeditated murder, first degree rape, forcible anal sodomy, and certain lesser crimes. In reviewing Ms. Gilchrist's involvement in the case we held:

> Ms. Gilchrist thus provided the jury with evidence implicating Mr. Mitchell in the sexual assault of the victim which she knew was rendered false and misleading by evidence [which she] withheld from the defense. Compounding this improper conduct was that of the prosecutor, whom the district court found "had labored extensively at trial to obscure the true DNA test results and to highlight Gilchrist's [contrary] test results[.]"

*Id*. at 1064 (internal citations and italics omitted).

7

During the course of her career, Ms. Gilchrist has been reprimanded by various professional associations. In 1987, the Southwestern Association of Forensic Scientists disciplined Ms. Gilchrist for violations of its ethical code. Additionally, in October of 2000, Ms. Gilchrist was expelled from the Association of Crime Scene Reconstruction for giving testimony that misrepresented the evidence and was not supported by scientific work.

C.      *District Attorney Macy*

Mr. Pierce alleges that as district attorney, Defendant Robert H. Macy established a policy or practice of employing false evidence and testimony from Defendant Gilchrist in the prosecutions of accused persons, including himself.

In the words of Mr. Pierce's complaint:

> Under Macy's administration the Oklahoma County District
> Attorney's office became perverted, seeking convictions of any
> targeted accused even when the investigations by the OCPD
> and the District Attorney's Office uncovered exculpatory
> evidence which clearly demonstrated his or her innocence.
> Gilchrist and others were coached, directed and influenced . . .
> to provide reports consistent with the OCPD's and Macy's
> theories of the cases in order to gain a "victory" and
> conviction regardless of actual guilt.

Compl. 19, App. 74.[1]

## II.  Defendant Gilchrist's Motion to Dismiss

---

[1] Unless otherwise noted, cites to the Appendix are to Defendant Gilchrist's Appendix.

8

A.	*Procedural History*

In an order dated July 31, 2002, the district court dismissed Plaintiff's complaint for failure to state a claim for which relief could be granted, granting him leave to amend. Plaintiff filed an amended complaint on August 13, 2002. Defendant Gilchrist again filed a motion to dismiss on the grounds that the Plaintiff had failed to correct defects in the original complaint and that she was entitled to qualified immunity. Under the framework enunciated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), courts are to conduct two distinct inquiries when encountering a defense of qualified immunity. First, the court must determine whether the facts, as pled by the plaintiff, set forth a constitutional violation. *Id.* Second, assuming that a violation has been properly alleged, the court is to determine whether such violation was clearly established as of the time of the conduct. *Id.* Failure to satisfy either of these inquiries will result in dismissal in favor of the defendant. *Id.* at 201-02; *see also Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003).

The district court found that neither inquiry supported Ms. Gilchrist's motion to dismiss. The court characterized the "right at issue in this case" as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity." Op. 12. The court identified the Fourth Amendment as the source of Mr. Pierce's right to be free

9

from unreasonable seizures (*id*. at 6-7), the Fourteenth Amendment Due Process Clause as the source of his right to be free from a deprivation of liberty (*id*. at 12), and the manufacture of false evidence as a due process violation *(id.)*. The court further found that Mr. Pierce's allegations most closely resemble common law claims for malicious prosecution. *Id.* at 6. Proceeding on this basis, the district court found that the Supreme Court's intimations in *Albright v. Oliver*, 510 U.S. 266 (1994), and *Heck v. Humphrey*, 512 U.S. 477 (1994), as well as this Court's explicit holdings in *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996); *Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996); *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995); *Cottrell v. Kaysville City*, 994 F.2d 730 (10th Cir. 1993); *Anthony v. Baker*, 955 F.2d 1395 (10th Cir. 1992); and *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990), all support the availability of a cause of action for claims analogous to malicious prosecution pursuant to 42 U.S.C. § 1983. Op. 5-6.

The court concluded that the amended complaint was based on acts Ms. Gilchrist performed in her investigative capacity, for which she is afforded only qualified immunity. The court also found that Plaintiff's "allegations, if proven, lead the Court to believe that a jury may conclude that Defendant's pretrial acts played an instrumental role in Plaintiff's continued post-trial confinement." *Id.* at 8-9.

Turning to whether Ms. Gilchrist's alleged misconduct violated clearly

established constitutional rights, the district court noted that the amended complaint alleges "willful and deceitful acts by Defendant, which if proven, support the theory that she knowingly violated Plaintiff's constitutional rights." *Id.* at 13. The court concluded that "Defendant should have known that her conduct would violate Plaintiff's constitutional rights, and as such, she is not entitled to qualified immunity." *Id.* at 13-14.

On appeal, Ms. Gilchrist challenges the district court's holding on each of these points. We evaluate her claims in the order presented.

B.    *Constitutional Violation*

The first question is whether the allegations in the amended complaint state a claim actionable under § 1983. That question requires us to foray into the much-contested relationship between constitutional torts and the common law.

1. How to Define a Constitutional Tort

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not provide a federal cause of action for every violation of state common law, and Plaintiff Pierce has not alleged any such violation. Plaintiff's amended complaint asserts claims under the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. Most pertinent are the Fourth Amendment right to be free

11

from unreasonable seizures, *Taylor*, 82 F.3d at 1560-61, and the Fourteenth Amendment right not to be deprived of liberty without due process of law, or more specifically, as the result of the fabrication of evidence by a government officer acting in an investigative capacity. *Anthony v. Baker*, 767 F.2d 657, 662-63 (10th Cir. 1985); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). The initial seizure[2] is governed by the Fourth Amendment, *Albright v. Oliver*, 510 U.S. 266 (1994), but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause. *Compare Taylor*, 82 F.3d at 1561 n.5 (noting that "it is unclear how far the Fourth Amendment's protection against unreasonable 'seizures' can reach in the pretrial context"); *Albright*, 510 U.S. at 277-81 (Ginsburg., J., concurring) (suggesting that Fourth Amendment standards extend throughout pre-trial proceedings), *with Castellano v. Fragozo*, 352 F.3d 939, 955 (5th Cir. 2003) (en banc) (holding that the "manufacturing of evidence and the state's use of that evidence . . . to obtain [defendant's] wrongful conviction indisputably denied him rights secured by the Due Process Clause"); *Newsome,* 256 F.3d at 752 (holding that the Due Process Clause is the proper basis for challenging the use of manufactured evidence at trial). It is not

---

[2] Mr. Pierce alleges that if Ms. Gilchrist had accurately reported the results of the hair analysis, he would have been released within five minutes of his arrest. Defendant Gilchrist does not dispute that Mr. Pierce's arrest and resulting confinement constituted a "seizure," though she does dispute whether she can be held responsible for it.

12

necessary in this case to determine where Fourth Amendment analysis ends and due process analysis begins, because Mr. Pierce raised claims under both constitutional provisions, and neither party argues that the difference in standards has any bearing on this appeal of the denial of the motion to dismiss.

Since *Carey v. Piphus*, 435 U.S. 247 (1978), courts have used the common law of torts as a "starting point" for determining the contours of claims of constitutional violations under § 1983. *Id*. at 257-58; *Wolford*, 78 F.3d at 489. The Courts of Appeals have taken somewhat inconsistent positions regarding how close the connection must be between common law tort doctrine and claims under § 1983. *See Taylor*, 82 F.3d at 1560-61 (recording the different approaches to the issue taken by the circuit courts); *Castellano,* 352 F.3d at 949-53 (same). The district court held that the closest common law analogy to Defendants' alleged conduct is the tort of malicious prosecution. The question before us is how the constitutional claims and the common law tort fit together. Ms. Gilchrist maintains that the allegations in the amended complaint do not state a common law cause of action for malicious prosecution as defined by the Oklahoma courts, and that this is fatal to Plaintiff's claim for vindication of Fourth and Fourteenth Amendment rights under § 1983.[3]

---

[3]Ms. Gilchrist also complains that the amended complaint did not allege a claim for malicious prosecution, and that the district court therefore erred when it
(continued...)

13

Ms. Gilchrist's analysis is based on her interpretation of our opinion in *Taylor.* As Ms. Gilchrist reads *Taylor,* satisfying each of the elements of Oklahoma tort law is a prerequisite for pursuing constitutional malicious prosecution claims. Proceeding on this assumption, Ms. Gilchrist notes that Oklahoma law mandates that a plaintiff demonstrate: (i) the bringing of the action by the defendant, (ii) its successful termination in favor of the plaintiff, (iii) want of probable cause to bring the action, (iv) malice, and (v) damages. Gilchrist Br. 6 (citing *Parker v. Midwest City*, 850 P.2d 1065, 1067 (Okla. 1993)). Ms. Gilchrist further notes that under Oklahoma law, probable cause at the initiation of the prosecution acts as a complete defense to a claim of malicious prosecution even if evidence vitiating probable cause subsequently emerges. Gilchrist Reply Br. 17 (citing *Greenberg v. Wolfberg*, 890 P.2d 895, 902 n.25 (Okla. 1994)).

From these principles Ms. Gilchrist argues that the amended complaint fails to state a claim. Mr. Pierce was arrested pursuant to a valid arrest warrant supported by an affidavit stating that the rape victim identified him from a photo lineup. Because Ms. Gilchrist was not involved in procuring the arrest warrant,

---

[3](...continued)
"unilaterally injected the claim of malicious prosecution" in its order of October 23, 2002. Gilchrist Br. 4. However, as explained more fully below, Plaintiff's actual cause of action is for a constitutional violation under § 1983; the common law tort of malicious prosecution is relevant only as an analogy that is helpful in structuring the legal analysis. Plaintiff's failure to plead malicious prosecution as a cause of action is therefore not fatal to his action.

14

and because the arrest was conducted and concluded prior to her involvement in the case, she argues that Mr. Pierce fails to plead the first required element: that she initiated the action against him. Building on this line of reasoning, Ms. Gilchrist maintains that because the warrant established probable cause that Mr. Pierce had committed the rape prior to her involvement in the prosecution, he cannot succeed in establishing the third required element: the absence of probable cause when the charges were initiated. Therefore, even assuming Ms. Gilchrist deliberately falsified her findings regarding the hair analysis – a claim she vigorously contests – Oklahoma law bars Mr. Pierce's claim of malicious prosecution.

Ms. Gilchrist's arguments, however, are premised on a dual misunderstanding of our holding in *Taylor*.[4] First, she assumes that the "common

---

[4] We recognize that *Taylor* has been interpreted in various ways by courts and commentators. *Compare Castellano*, 352 F.3d at 951 (interpreting *Taylor* as "requiring proof of all common law elements"), *with Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000) (interpreting *Taylor* as incorporating only "certain elements" of the common law tort into analogous Fourth Amendment claims), *and* Jacques L. Schillaci, Note, *Unexamined Premises: Towards Doctrinal Purity in § 1983 Malicious Prosecution Doctrine,* 97 Nw. U. L. Rev. 439, 460-61 (2002) (including the Tenth Circuit in the "majority rule" which does not require a § 1983 plaintiff to prove the common law elements of malicious prosecution), *with* Joseph G. Yannetti, Note, *Who's on First, What's on Second, And I Don't Know About the Sixth Circuit: A § 1983 Malicious Prosecution Circuit Split that Would Confuse Even Abbot & Costello*, 36 Suffolk U. L. Rev. 513, 524 (2003) (understanding that the Tenth Circuit "requires a plaintiff satisfy the common-law tort elements as well as show the deprivation of a right secured under the Fourth
(continued...)

law" to which *Taylor* refers is limited to the specific formulation of the tort in the law of the relevant state; here, Oklahoma. Second, she finds that "starting point" analysis requires satisfaction of each of the common law elements as a prerequisite for consideration of the federal constitutional question. Neither of these assumptions is correct.

*Taylor* was a § 1983 suit by a plaintiff who had been arrested and held for seven weeks before being exonerated of a crime. He sued the sheriff who arrested him, claiming that the sheriff knowingly made false statements in the affidavit used to procure the arrest warrant. As in the present case, the alleged constitutional violation was of the Fourth Amendment right to be free from unreasonable seizures, and the closest common law analogy was to the torts of false arrest and malicious prosecution. *Taylor*, 82 F.3d at 1560-61.[5] Unlike the present case, however, the Court concluded that the inaccuracies in the affidavit were not significant enough to vitiate probable cause, *id.* at 1562, and that there was "*no* evidence which even suggests that [the sheriff] included the false statements, or omitted any facts, knowingly or with reckless disregard for the truth," *id.* at 1563 (emphasis in original). In the present case, by contrast,

---

[4](...continued)
Amendment").

[5] Because Taylor was exonerated before trial, the case involved only the Fourth, and not also the Fourteenth Amendment. We consider the reasoning equally applicable to both.

16

accepting the allegations in the amended complaint as true for purposes of the motion to dismiss, we cannot say that the false information supplied by Ms. Gilchrist and the accurate exculpatory information disregarded by Ms. Gilchrist were not significant enough to prejudice Mr. Pierce's constitutional rights, or that Plaintiff's allegations regarding her intent are baseless. The legal framework employed in *Taylor* thus points to the opposite result in this case.

Nor does *Taylor*'s explanation of its legal holding, on which Ms. Gilchrist relies, support her position. After reviewing the division amongst the Courts of Appeals regarding the degree to which the elements of a § 1983 constitutional tort claim correlate with the common law elements of malicious prosecution, and noting that "[o]ur own circuit has not always written consistently on this issue," *Taylor* explained that although the common law elements provide the "starting point" for the analysis of a § 1983 malicious prosecution claim, the ultimate question is whether plaintiff can prove a constitutional violation. *Id.* at 1561. *Taylor* is thus inconsistent with Ms. Gilchrist's argument that proof of each element of the common law tort, as defined by the state in which the alleged violation occurred, is a necessary predicate to a claim under § 1983. That would make the common law tort not a "starting point" for analysis but the final word.

Contrary to Ms. Gilchrist's first assumption, the term "common law," in this context, refers not to the specific terms of the tort law of any particular state,

17

but to general principles of common law among the several states. *Cf. Wyatt v. Cole*, 504 U.S. 158, 163-64 (1992) (looking to general common law principles in deciding which common law immunities are applicable to § 1983 actions). It would be odd to interpret a statute, § 1983, which was enacted during Reconstruction to provide a federal remedy for violations of civil rights countenanced under state law, as simply incorporating the positive law of the states as a standard for evaluating federal constitutional claims. A federal standard was assumed. We have turned to the common law in § 1983 cases not because of its authority as positive law, but because, as the Supreme Court has explained, "over the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights." *Carey*, 435 U.S. at 257. Those rules are applicable by analogy – but only by analogy – to constitutional torts. [6]

---

[6]The framers of the Civil Rights Acts from which § 1983 derived tended to assume, in accord with legal theories of the day, that there existed a general common law and this general common law was an articulation of the civil rights and responsibilities associated with free citizens. In a single speech, Senator Lyman Trumbull, the principal author of the Civil Rights Act of 1866, the precursor of § 1983, defined the term "civil rights" as "rights pertaining to the citizen as such," as "general rights that belong to mankind everywhere," and as "a common law right." Cong. Globe, 42d Cong., 2d Sess. 3191 (May 8, 1872). It is therefore inconsistent with the spirit of § 1983 to treat "common law" as nothing more than judge-made, state-specific, positive law.

The Supreme Court's analysis in *Heck* serves as an illustration. In *Heck*, a prisoner of the state of Indiana filed a § 1983 action complaining that defendants, under color of state law, "engaged in an 'unlawful, unreasonable and arbitrary investigation' leading to petitioner's arrest; 'knowingly destroyed' evidence 'which was exculpatory in nature and could have proved petitioner's innocence'; and caused 'an illegal and unlawful voice identification procedure' to be used at petitioner's trial." 512 U.S. at 479 (internal brackets omitted). *Heck* considered whether the common law rule requiring the prior criminal proceeding to be terminated in favor of the accused before a malicious prosecution claim can be raised is applicable to federal § 1983 actions. *Id*. at 484-86. Rather than narrowly focusing on the particular formulation given to the tort by the Indiana courts, the Court built its analogy by surveying treatises and case law from a variety of jurisdictions. *Heck* thus teaches that federal courts fashioning constitutional analogues to traditional common law torts should refer to the general common law tradition, rather than to the law as defined by the jurisdiction where the action originated.

Ms. Gilchrist's second and related assumption is that a § 1983 plaintiff must meet every element of the tort as prescribed by the common law. But to treat § 1983 claims as strictly defined by, and limited to, recognized common law torts would be inconsistent with our approach in *Wolford*, 73 F.3d at 489, and

*Taylor*, 82 F.3d at 1561. In *Taylor*, for example, the Court began by briefly reciting the elements of the common law tort of malicious prosecution. But that was just the starting point of the analysis. It quickly turned to constitutional concerns, which for the pre-trial wrongs at issue were located in the Fourth Amendment. Restating the standards set forth in *Wolford*, *Taylor* relied on Tenth Circuit and Supreme Court constitutional precedents – not state law – to conclude that the Fourth Amendment would be violated if police knowingly or with reckless disregard included false statements in affidavits that formed the basis for the issuance of warrants. *Id*. at 1562. Indeed, this Court has never interpreted constitutional violations under § 1983 solely in light of common law principles. *See Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001) ("The cases recognize that evaluations of rights and duties under § 1983 . . . arising as they do under the Fourteenth Amendment to the Constitution of the United States, are often different from counterpart common law actions which arise under state substantive law.") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)). Although the common law tort serves as an important guidepost for defining the constitutional cause of action, the ultimate question is always whether the plaintiff has alleged a constitutional violation. *Taylor*, 82 F.3d at 1561.

These principles find their origin in the Supreme Court's decision in *Carey*.

20

In discussing how the common law of torts properly serves as a reference point for interpreting § 1983, the Court held:

> It is not clear however, that common-law tort rules of damages will provide a complete solution to the damages issue in every § 1983 case. In some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interest protected by a particular constitutional right. In such cases, it may be appropriate to apply the tort rules of damages directly to the § 1983 action. In other cases, the interests protected by a particular constitutional right may not also be protected by an analogous branch of the common law torts. In those cases, the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by deprivation of constitutional right.
> . . . The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action.

435 U.S. at 258 (internal citations and quotations omitted).

Similarly, in *Albright v. Oliver*, 510 U.S. 266 (1994), the plaintiff sued under §1983 for constitutional violations stemming from an arrest without probable cause. The plurality noted that "the extent to which a claim of malicious prosecution is actionable under § 1983 is one 'on which there is an embarrassing diversity of judicial opinion.'" *Id.* at 270 n.4 (citation omitted). Rather than focusing on the elements of the malicious prosecution tort, however, the Court addressed whether the claim was predicated on a federal constitutional violation.

Even in the context of 42 U.S.C. § 1988, which the Supreme Court has

21

interpreted as directing federal courts to supplement the civil rights statutes by borrowing from forum state common law, the Court has held that "Congress surely did not intend to assign to state courts and legislatures a conclusive role in the formative function of defining and characterizing the essential elements of a federal cause of action." *Wilson v. Garcia*, 471 U.S. 261, 269 (1985). Thus, for example, although as a general matter federal courts look to state law in fashioning rules regarding whether a § 1983 claim survives the plaintiff's death, *Robertson v. Wegmann*, 436 U.S. 584 (1978), they will not do so if such a rule would frustrate the very purpose of the § 1983 action. *See e.g.*, *Jaco v. Bloechle*, 739 F.2d 239, 244 (6th Cir. 1984):

> The § 1983 objective of protecting individual civil liberties by providing compensation to the victim for an illegal deprivation of constitutional entitlements by state officers cannot be advanced, and is only undermined, by deferring to a state law which decrees abatement under circumstances where, as here, asserted constitutional infringements resulting from action taken under color of law caused instant death.

*Id.* [7]

Finally, and most importantly, we have stressed in *Taylor* and other cases

---

[7]This is not to imply that common law principles are necessarily incompatible whenever they deny or limit the remedy for an apparent constitutional infraction. *See Heck*, 511 U.S. at 484-86 (common law rule requiring termination of prior criminal proceeding is applicable to the federal malicious prosecution action). The common law immunities and limits to liability serve important purposes, and have often been held applicable to § 1983 actions. *See, e.g., Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Tenney v. Brandhove*, 341 U.S. 367 (1951).

that the "ultimate question" is the existence of a constitutional violation. *Taylor*, 82 F.3d at 1561; *Wolford*, 78 F.3d at 489. Mr. Pierce has alleged violations of his constitutional rights, pursuant to § 1983; he has not alleged a common law tort. While common law principles are useful in giving structure to constitutional claims under § 1983, and thus serve as a "starting point," we fail to see the logic in a position that would confine constitutional claims to the precise rubric of tort law. As Judge Higginbotham recently stated for an en banc Fifth Circuit, "[t]he Fourth Amendment of the United States Constitution cannot be circumscribed by state tort law." *Castellano*, 352 F.3d at 955. We thus join the Fourth, Fifth, Seventh, and Eleventh Circuits in rejecting the view that a plaintiff does not state a claim actionable under §1983 unless he satisfies the requirements of an analogous common law tort.[8]

    2.    <u>Ms. Gilchrist's Arguments Based on the Oklahoma Common Law of</u>

---

[8] *See Lambert v. Williams*, 223 F.3d 257, 261-62 & n.2 (4th Cir. 2000); *Castellano*, 352 F.3d 939; *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001); *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996). Other circuits, however, have taken the opposite view. *See Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (listing the common law elements as part of the federal action); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)("the court must engage in two inquiries: whether the defendant's conduct is tortous; and whether plaintiff's injuries were caused by the deprivation of a liberty guaranteed by the Fourth Amendment."); *Donahue v. Gavin*, 280 F.3d 371, 380 n.16 (3d Cir. 2002) (noting that the Third Circuit had remanded a claim because "the district court did not rule on whether [the plaintiff] had satisfied the common law elements of a malicious prosecution claim"); *Poppell v. City of San Diego*, 149 F.3d 951, 961-63 (9th Cir. 1998).

Malicious Prosecution

We now turn to Ms. Gilchrist's specific arguments concerning the amended complaint's failure to state a claim. She frames these arguments as attacks on the district court's holding that the amended complaint satisfies each of the five elements of the tort of malicious prosecution as defined by the Oklahoma courts. Some of her arguments are nothing more than a quarrel over what the evidence will show. We can pass by these arguments quickly, since on a motion to dismiss we must accept the plaintiff's allegations as true. Other arguments are legal in nature, and point to ways in which Plaintiff's constitutional claims are not congruent to the analogous common law claims. These we will examine in light of the structural principles set forth in the preceding pages. Because we treat the tort of malicious prosecution as a starting point, as to each element where the tort and the alleged constitutional claims diverge, we will assess whether the district court was correct in finding an actionable claim under § 1983.

a. Initiation of the original action.

Ms. Gilchrist first argues that the amended complaint is insufficient because it does not allege that she initiated the original action against Mr. Pierce. Citing *Parker v. Midwest City*, 850 P.2d 1065, 1067 (Okla. 1993), she argues that an action for malicious prosecution may be brought under Oklahoma law only against a person or persons responsible for bringing the original action. Since she

24

was not involved in Mr. Pierce's arrest nor was she responsible for filing charges, she infers that, as a matter of law, she is not liable for her alleged fabrication of evidence and failure to disclose exculpatory evidence.

The district court held that Ms. Gilchrist's lack of responsibility for initiating the action "does not absolve Defendant from total liability." Op. 7-8. The court held that "[i]f Defendant was instrumental in Plaintiff's continued confinement or prosecution, she cannot escape liability." _Id._ at 8. The amended complaint alleges that Ms. Gilchrist "with deliberate indifference . . . contrived evidence to secure a fraudulent conviction." It further alleges that Ms. Gilchrist repeatedly communicated these false and fraudulent findings to police and the district attorney, providing the basis upon which the district attorney filed charges against him. Specifically, Mr. Pierce claims that after his arrest, he was assured that he would be released if a comparison of his hair samples did not match those found at the crime scene. Ms. Gilchrist falsely reported that the hairs were consistent; had she truthfully reported that they were not consistent, Mr. Pierce would have been released within hours of his arrest, and never tried. This was aggravated by Ms. Gilchrist's failure to deliver the hair samples for review by an independent forensic examiner hired by the defense, as required by law. Moreover, as alleged in the amended complaint, when preparing her forensic report on the case, Ms. Gilchrist performed an enzyme test that conclusively

25

demonstrated that Mr. Pierce could not have been the source of the semen found on the rape victim, but Ms. Gilchrist disregarded and disputed the significance of this evidence in her report. Accepting these allegations as true, the district court concluded that a jury could find her actions "played an instrumental role" in Mr. Pierce's confinement. Op. 8-9.

We agree with the district court. Examining the general common law as a "starting point," we find that Ms. Gilchrist's argument assumes too narrow an understanding of the tort of malicious prosecution. As the *Restatement* indicates, "[a] private person who takes an active part in *continuing or procuring the continuation* of criminal proceedings *initiated by himself or by another* is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." *Restatement (Second) Torts* § 655 (emphasis added). The comments to this section note that it "applies . . . when the proceedings are initiated by a third person, and the defendant, knowing that there is no probable cause for them, thereafter takes an active part in procuring their continuation." *Id.*, cmt. b. The allegations in Mr. Pierce's amended complaint meet these standards. Mr. Pierce alleges that Ms. Gilchrist provided several false oral and written reports and withheld exculpatory evidence from the OCPD and the District Attorney's Office. According to Mr. Pierce, these reports "became an inseparable basis" for the charges against Pierce and the District Attorney's

26

decision to proceed to trial.

Turning to federal standards, § 1983, by its terms, applies not only to a person who "subjects," but also to any person who "*causes to be subjected . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.*"  42 U.S.C. § 1983 (emphasis added).  This suggests that Congress was concerned not just with the officer who formally initiates the process that leads to an unconstitutional seizure, but to all those who were the "cause" of deprivations of constitutional rights.

This Court has previously held that officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions.  *Robinson v. Maruffi*, 895 F.2d 649, 655-66 (10th Cir. 1990).  *Robinson*, in turn, relied on the Seventh Circuit's decision in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), which, in light of the issues presented here, bears recounting.

*Jones* was a § 1983 action for malicious prosecution against several members of the Chicago police force who conspired to frame an innocent George Jones for murder and rape.  *Id.* at 988-92.  Among the numerous defendants was a lab technician who concealed exculpatory blood, semen, and hair evidence from

27

the relevant file. *Id.* at 991. The jury returned a verdict of more than $800,000

against the police defendants. Thereafter, the defendants challenged the verdict

on the basis that the intervening acts by the state prosecutor to charge and

prosecute Jones shielded them from liability for malicious prosecution. *Id.*

Rejecting this contention, the Seventh Circuit, per Judge Posner, held:

> [A] prosecutor's decision to charge, a grand jury's decision to
> indict, a prosecutor's decision not to drop charges but to
> proceed to trial – none of these decisions will shield a police
> officer who deliberately supplied misleading information that
> influenced the decision. . . .
>     *If police officers have been instrumental in the
> plaintiff's continued confinement or prosecution, they cannot
> escape liability by pointing to the decisions of prosecutors or
> grand jurors, or magistrates to confine or prosecute him. They
> cannot hide behind the officials whom they have defrauded.*

*Id*. at 994 (emphasis in original) (cited with approval in *Robinson*, 895 F.2d at

656).

Accordingly, Ms. Gilchrist cannot "hide behind" the fact that she neither

initiated nor filed the charges against Mr. Pierce. The actions of a police forensic

analyst who prevaricates and distorts evidence to convince the prosecuting

authorities to press charges is no less reprehensible than an officer who, through

false statements, prevails upon a magistrate to issue a warrant. In each case the

government official maliciously abuses a position of trust to induce the criminal

justice system to confine and then to prosecute an innocent defendant. We view

both types of conduct as equally repugnant to the Constitution.

28

Ms. Gilchrist also maintains, as a factual matter, that she "was *not* instrumental in the Plaintiff's continued confinement or prosecution." Gilchrist Br. 7 (emphasis in original). She places great weight on the fact that she reported only that the hairs found at the crime scene "*could have come* from Plaintiff," *id.* at 8 (emphasis in original) and never claimed that the hair comparison constituted a positive identification. However, if Ms. Gilchrist had correctly reported that the hairs *could not have come* from Mr. Pierce – which the amended complaint alleges was the true result of her examination – Mr. Pierce argues that he would have been exonerated. The same is true if she had submitted a proper report of her enzyme comparison of Mr. Pierce's blood to the perpetrator's semen.

In the case of a Fourth Amendment claim of falsified evidence, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. *Wolford*, 78 F.3d at 489 (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). In a case involving the withholding of exculpatory evidence, the existence of probable cause is determined by examining the evidence "as if the omitted information had been included" and inquiring whether probable cause existed in light of all the evidence, including the omitted information. *Wolford*, 78 F.3d at 489 (quoting *Stewart v. Donges*, 915 F.2d 572, 582 n.13 (10th Cir. 1990)). *See also Taylor*, 82 F.3d at 1562.

29

To the extent that Ms. Gilchrist's alleged actions are more appropriately viewed as due process violations, several courts have recognized that police officers can be liable under the Due Process Clause, pursuant to § 1983, for withholding exculpatory evidence. *See Newsome*, 256 F.3d 747; *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc); *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 275 (1993) (prosecutor's fabrication of false evidence during preliminary investigation of crime is not entitled to absolute immunity); *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) (officer not entitled to absolute immunity on claims that he manufactured probable cause and fabricated evidence). There is some disagreement in these cases over what degree of intent the officer must have, but if it is true that Ms. Gilchrist maliciously withheld exculpatory evidence and fabricated inculpatory evidence, as alleged, her actions would satisfy even the most demanding standards put forth by the courts.

Applying these principles, we conclude that Mr. Pierce has met his pleading requirements. He alleges that Ms. Gilchrist, with knowing and reckless disregard for the truth, informed the police and prosecutorial authorities that hair analysis supported Pierce's involvement in the rape – even though in fact, far from implicating him in the rape, the hair analysis tended to exonerate him – and disregarded findings that Mr. Pierce's blood contained an enzyme that exonerated

30

him of being the source of the sperm found on the rape victim. Although at this stage of the litigation it is too early to judge the facts of the matter, these allegations are sufficient to survive a motion to dismiss.

b. Termination of the original action in favor of the Plaintiff.

The second element in the tort of malicious prosecution is that the original action must have been terminated in favor of the plaintiff. The Supreme Court has recognized this element as part of a § 1983 claim for unconstitutional conviction or imprisonment. *Heck*, 512 U.S. at 486-87. Citing *Young v. First State Bank*, 628 P.2d 707, 709-10 (Okla. 1981), Ms. Gilchrist argues that under Oklahoma law, dismissal of an action cannot support the successful termination requirement when the dismissal is "procured by the defendant of the original action, or done pursuant to a compromise or agreement of the parties." Gilchrist Br. 11.

We conclude the exception is inapplicable. In *Young,* the plaintiff in the original action settled a civil lawsuit after receiving full monetary satisfaction from one of the defendants. In a subsequent lawsuit for malicious prosecution, the plaintiff (the defendant in the original action) pointed to dismissal of the first action after settlement as "successful termination." The Oklahoma Supreme Court noted a general rule that a settlement is not a successful termination "because either the settlement is an admission of probable cause for the initiation

31

of the prosecution, or because it would be unfair to allow a person to consent to a termination and then take advantage of it." *Id.* at 710 (citing 52 Am. Jur. 2d § 44, Malicious Prosecution). But the court rejected the contention that one defendant's settlement claim barred the malicious prosecution claim of another defendant who entered no such agreement. Here, dismissal of the criminal proceeding against Mr. Pierce was not pursuant to any agreement between Mr. Pierce and the state.

In any event, such a narrow construction of state common law would be inconsistent with federal constitutional standards. *See Heck*, 510 U.S. at 487 (allowing a § 1983 plaintiff to sue on analogy to malicious prosecution when he proves "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus"). The district court for Oklahoma county in Mr. Pierce's case "vacated, set aside and held for naught" his conviction and sentence "because Petitioner Pierce is factually innocent of committing the crimes for which he was charged and convicted." It is hard to imagine a more successful – albeit belated – termination than the exoneration Mr. Pierce received from the Oklahoma County district court after it examined the DNA evidence.

    c. *Probable cause for the arrest*.

The third element in the tort of malicious prosecution is that there was no probable cause to support the original arrest, continued confinement, or prosecution. The probable cause requirement is central to the common law tort, because not every arrest, prosecution, confinement, or conviction that turns out to have involved an innocent person should be actionable. Neither Ms. Gilchrist nor Mr. Pierce disputes that the constitutional tort of malicious prosecution also requires an absence of probable cause, and so we may assume that it does. Probable cause must be evaluated as of the events in question. Thus, the mere fact that DNA evidence conclusively exonerated Mr. Pierce is insufficient to support his claim.[9] On remand, he will bear the heavy burden of showing that Ms. Gilchrist's falsification of inculpatory evidence or suppression of exculpatory evidence was necessary to the finding of probable cause: that without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would have been no probable cause for his continued confinement or prosecution. *Stewart*, 915 F.2d at 582 n.13; *Wolford*, 78 F.3d at 489; *Taylor*, 82 F.3d at 1562.

---

[9]Ms. Gilchrist's opening and reply briefs assert that "Plaintiff's entire lawsuit is based on the illogical premise that because modern 2001 DNA technology freed him from prison, *ipso facto*, his 1986 arrest, prosecution, and conviction must have resulted from a violation of Plaintiff's constitutional rights." Gilchrist Br. 12-13; Reply Br. 18. This is a most unfair characterization of Plaintiff's position. Plaintiff's lawsuit is based on allegations that Ms. Gilchrist intentionally and knowingly falsified evidence that should have exonerated him back in 1986, wholly apart from the DNA evidence, which was not available at that time.

The dispute that we must resolve in this case concerns only *when* the absence of probable cause must be shown. Ms. Gilchrist argues that under Oklahoma law, existence of probable cause *at the time of the arrest,* is a complete defense to malicious prosecution. Gilchrist Reply Br. 17 (citing *Greenberg*, 890 P.2d at 902 n.25). The district court, however, held that "[e]ven when probable cause is present at the time of the arrest, evidence could later surface which would eliminate that probable cause." Op. 8. We agree with the district court for two reasons.

First, as already discussed, we do not share Ms. Gilchrist's view regarding the relevance of a particular state's tort law in assessing the presence of a constitutional violation. The consensus of the common law extends liability to those who continue prosecutions against criminal suspects upon knowledge that there is no probable cause to proceed against the accused. *See Restatement (Second) of Torts* § 655 & cmt. b; W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 119 (5th ed. 1984) ("The defendant may be liable either for initiating or continuing a criminal prosecution without probable cause.").[10] Accordingly, the allegation that Ms. Gilchrist's "false reports became

---

[10] Indeed, we are not convinced that Ms. Gilchrist's interpretation even of Oklahoma law is correct. The case on which she relies, *Greenberg,* was decided in a markedly different factual context and does not obviously support her legal argument. There, the defendant Wolfberg had initiated several successive and

(continued...)

34

one of the inseparable bases for the charges against Pierce and the District Attorney's decision to proceed to trial," Compl. 12, App. 67, states a valid cause of action under general common law principles and provides an appropriate analogy for the constitutional claim.

Because the common law provides only an analogy to the constitutional claim, moreover, federal standards are ultimately dispositive. Ms. Gilchrist argues, in effect, that if probable cause existed for the arrest, the Fourth Amendment is not violated if an official falsifies or withholds evidence that, if

---

[10](...continued)
apparently meritless lawsuits against Greenberg, based on the same cause of action. Greenberg then filed tort claims in federal court against Wolfberg for malicious prosecution and abuse of process in filing the unfounded actions. The appeal reached the Tenth Circuit, which certified to the Oklahoma Supreme Court the question of whether under Oklahoma law each of these lawsuits filed against Greenberg could be combined into one "process" for purposes of the malicious prosecution claim. The Oklahoma Supreme Court stated that ordinarily, to qualify as a suit for purposes of the malicious prosecution claim, each individual suit must satisfy all the elements of the tort, including the lack of probable cause. However, where an earlier action, brought upon probable cause, had been decided in favor of the malicious-prosecution plaintiff, malicious prosecution actions based on the successive cases could make use of the decision in the first case to demonstrate the lack of probable cause in the successive actions.

Viewed in its context, the Oklahoma court's statements in *Greenberg* have little bearing on the issues presented in this case. *Greenberg* was not a case in which subsequent evidence arises which eliminates the factual basis for the action. Although we will not speculate as to how an Oklahoma court would decide this case, we note that Ms. Gilchrist fails to point to any source of Oklahoma law that forecloses recovery against a party who proceeds with a prosecution despite finding evidence through its own investigation vitiating probable cause.

35

accurately reported, would vitiate that probable cause and lead to immediate release and exoneration. That argument is inconsistent with this Court's holding in *Wolford* that it is a violation of the Fourth Amendment not only for an arrest warrant affiant to include false statements in the affidavit, but to "knowingly or recklessly omit from the affidavit information which, if included, *would have vitiated probable cause.*" 78 F.3d at 489 (emphasis added) (citing *Stewart v. Donges*, 915 F.2d 572, 581-83 (10th Cir. 1990)); *see also Taylor*, 82 F.3d at 1562.

From a constitutional perspective, Ms. Gilchrist has not suggested any reason to distinguish between falsifying evidence to facilitate a wrongful arrest and engaging in the same conduct several days later to induce prosecutors to initiate an unwarranted prosecution.[11] Either way, the government official's

---

[11]Ms. Gilchrist relies on the Fifth Circuit's holding in *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000), to claim that Mr. Pierce is foreclosed from bringing Fourth Amendment challenges to his continued confinement. Specifically, she points to *Jones*'s holding that "Fourth Amendment claims are appropriate [only] when the complaint contests the method or basis of the arrest and seizure of the person. The protections of the Fourth Amendment do not apply if plaintiff challenges only continued incarceration." *Id.* (quoting *Brooks v. George County,* 84 F.3d 157, 166 (5th Cir. 1996)) (brackets in original; citations omitted). Plaintiff, however, also alleges Fourteenth Amendment violations, which the same circuit, sitting en banc, has held to be independently actionable. *See Castellano*, 352 F.3d at 958. Gilchrist cites no precedent from this Court distinguishing the standards applicable to constitutional malicious prosecution claims grounded in the Fourth Amendment from those applicable to claims based on the Due Process Clause. Instead, her defense to the Due Process claim is to deny causation: "Plaintiff has failed to allege how any deprivation of life, liberty or property flowed from Defendant Gilchrist's actions." Gilchrist Br. 20-21. On

(continued...)

36

serious abuse of power leads to the prosecution of innocent defendants. Our holding in *Robinson*, 895 F.2d at 656, makes clear that when the fabrication of evidence results in a constitutional deprivation, the official's responsibility for that deprivation does not hinge on the exact stage of investigatory or prosecutorial process at which the fabrication occurred. To the extent that Oklahoma law would erect such distinctions, we decline to adopt them as a matter of federal law.

d. Malice.

Ms. Gilchrist's objections regarding the malice requirement appear to be based on denial of the veracity of the allegations in the amended complaint. *See* Gilchrist Br. 17 ("There is absolutely nothing about Defendant Gilchrist's performance of her discretionary duties that would support a finding of malice regarding her out of court duties."); *id*. ("Defendant Gilchrist did nothing wrong regarding the preparation of her report."). We see no reason to dispute the district court's conclusion that "the allegations, if proven, would support that Defendant possessed malice in the performance of her out-of-court duties."[12]

[11](...continued)
that point we agree with Judge Posner's observation in *Jones v. City of Chicago* that whether the action is properly brought pursuant to the Fourth Amendment, the Due Process Clause, or the Eighth Amendment, "the causal inquiry is unchanged. If police officers have been instrumental in the plaintiff's continued confinement or prosecution . . . [t]hey cannot hide behind the officials whom they have defrauded." 856 F.2d at 994.

[12]Neither party has questioned the applicability of malice as an element of a
(continued...)

e. Damages.

Similarly, Ms. Gilchrist's argument on the requirement of damages is based on a factual denial that she did anything wrong, Gilchrist Br. 18 ("There is absolutely no evidence or factual allegations to indicate that Defendant Gilchrist acted inappropriately."), or a repetition of her argument regarding probable cause, which has already been addressed. Reply Br. 23 ("Plaintiff has failed to prove damages because probable cause existed for his arrest, prosecution and conviction.").

C.    *Clearly Established Law*

When evaluating a qualified immunity defense, after identifying the constitutional right allegedly violated, courts must determine whether the conduct was objectively reasonable in light of clearly established law at the time it took place. *See Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We take March 1, 1986, the date of Ms.

---

[12](...continued)
§ 1983 claim, and we therefore have no occasion to address the issue. *See Franks*, 438 U.S. at 155-56 (employing a standard of "knowingly and intentionally, or with reckless disregard for the truth," falsifying or omitting evidence, in the context of Fourth Amendment challenges); *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988) (requiring a showing of "bad faith" in the context of due process challenge to failure to preserve evidence); *see also Stewart*, 915 F.2d at 581-83; *Wolford*, 78 F.3d at 489; *cf. Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc) (equally divided court) (considering whether the failure of police to provide exculpatory evidence is actionable under § 1983 in the absence of specific intent).

38

Gilchrist's first interaction with Mr. Pierce, as the relevant date for purposes of determining whether Mr. Pierce's rights were clearly established. The district court defined the right at issue in this case as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government official." Op. 12. In finding that right clearly established at the time of the conduct, the district court looked to *Anthony*, which found a constitutional violation when state officials "conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction." 767 F.2d at 662. The court also relied on *Norton v. Liddel*, 620 F.2d 1375 (10th Cir. 1980), which found an actionable constitutional violation when the sheriff and prosecutor conspired to cause a false information to issue, charging the plaintiff with inciting a riot.

In response to the district court's denial of qualified immunity, Ms. Gilchrist argues that there are no "actual specific details of concrete cases which indicate" that her alleged conduct violated clearly established law. Gilchrist Br. 26. Ms. Gilchrist points to factual differences between her alleged conduct and the facts of the cases cited by the district court and concludes that these distinctions prevent those cases from clearly establishing the law as applied to her conduct. Specifically, Ms. Gilchrist claims that unlike the criminal suspect in *Anthony*, Mr.

Pierce was arrested pursuant to a valid arrest warrant issued upon probable cause. Similarly, Ms. Gilchrist finds *Norton* distinguishable because, unlike the *Norton* defendant, Mr. Pierce was already in custody pursuant to legal process when the alleged false statements and material omissions were made. She also argues that *Norton* is distinguishable because it involves a conspiracy whereas she did not conspire.

Ms. Gilchrist overemphasizes the degree of specificity required of prior cases to clearly establish the law. In *Hope v. Pelzer*, the Supreme Court emphasized:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

536 U.S. 730, 739 (2002) (internal quotation marks and citations omitted). The Court proceeded to discuss *United States v. Lanier*, 520 U.S. 259 (1997), which held that the "clearly established" prong of the qualified immunity analysis is identical to the "fair warning" standard given to officials facing criminal charges pursuant to 18 U.S.C. § 242 (criminalizing the deprivation of a citizen's constitutional rights under color of state law). *Id.* at 270-71. In an effort to summarize and synthesize the Court's approach towards clearly established law,

*Hope* concluded:

> [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. . . . [T]he salient question . . . is whether the state of the law [at the time of the conduct] gave respondents fair warning that their alleged treatment of [plaintiff] was unconstitutional.

536 U.S. at 741.

*Hope* thus shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional. As this Court held even prior to *Hope*, qualified immunity will not be granted if government defendants fail to make "reasonable applications of the prevailing law to their own circumstances." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999)).

The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. *See Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002) (noting that the "constitutional provision may be so clear

41

and the conduct so bad that case law is not needed to establish that this conduct cannot be lawful"); *cf. Austin v. Hamilton*, 945 F.2d 1155, 1158 (10th Cir. 1991) ("It is only by ignoring the particularized allegations of deplorable violence and humiliation advanced by plaintiffs that defendants are able to argue for qualified immunity.").

No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest. In *Stewart*, 915 F.2d at 581-83, the plaintiff alleged violations of his Fourth and Fourteenth Amendment rights arising from an investigation of a reported larceny. According to the plaintiff, the defendant, a detective with the local police force, conducted an inadequate investigation, made material misrepresentations and omissions in his affidavit in support of the warrant application, and then arrested plaintiff without probable cause. In response to defendant's claim of qualified immunity, the court analyzed whether the law prohibiting such conduct was clearly established as of January 8, 1986, the day of the alleged arrest. *Id.* at 581. *Stewart* noted that the Supreme Court's ruling in *Franks v. Delaware*, 438 U.S. 154 (1978), clearly established that knowingly, or with reckless disregard for the truth, including false information in the affidavit supporting the arrest warrant constituted a Fourth Amendment violation. *Id.* at

42

581-82 (quoting *Franks*, 438 U.S. at 155-56). *Stewart* went on to consider whether the same principles applied to knowing or reckless *omissions* of material facts which would have vitiated probable cause. Although *Stewart* found no Tenth Circuit decisions on point, after reviewing case law from other circuits, the court concluded, "we hold that at the time defendant submitted his affidavit and arrested plaintiff [early January of 1986], it was a clearly established violation of plaintiff's Fourth and Fourteenth Amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause." *Id.* at 582-83.

A similar analysis applies under the Due Process Clause. Long before the events in question, the Supreme Court held that a defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction, *Pyle v. Kansas,* 317 U.S. 213, 216 (1942), or withholds exculpatory evidence from the defense, *Brady v. Maryland*, 373 U.S. 83 (1963). *See Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999) (rejecting qualified immunity where officers allegedly fabricated evidence and manufactured probable cause; holding that on the basis of *Brady* and *Pyle* "[the defendant] cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights."); *Newsome*, 256 F.3d at 752-53 (finding that *Brady* clearly

43

established that officers could not withhold information that plaintiff's fingerprints did not match those found at the crime scene or that officers influenced witnesses to pick plaintiff out of police lineup).

We have no doubt that, in light of these holdings, an official in Ms. Gilchrist's position in 1986 had "fair warning" that the deliberate or reckless falsification or omission of evidence was a constitutional violation – even though the arrest had already occurred. There is no moral, constitutional, common law, or common sense difference between providing phony evidence in support of an arrest and providing phony evidence in support of continued confinement and prosecution. Even if there were no case directly on point imposing liability on officials whose falsification of evidence occurred at the post-arrest stage, an official in Ms. Gilchrist's position could not have labored under any misapprehension that the knowing or reckless falsification and omission of evidence was objectively reasonable.

Qualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms. Ms. Gilchrist's alleged misconduct did not stem from a miscalculation of her constitutional duties, nor was it undertaken in furtherance of legitimate public purposes that went awry. Rather, as alleged, Ms. Gilchrist

44

engaged in a deliberate attempt to ensure the prosecution and conviction of an innocent man. Such conduct, if it can be proven at trial, violated Mr. Pierce's constitutional rights with "obvious clarity."

For these reasons the district court's denial of qualified immunity to Defendant Gilchrist is affirmed.

### III. Defendant Macy's Motion to Dismiss

In ruling on Mr. Macy's motion to dismiss, the district court held that he was entitled to Eleventh Amendment immunity on the claims pending against him in his official capacity. Regarding claims pursued in Mr. Macy's individual capacity, the district court's ruling was split. The district court dismissed claims that Mr. Macy (i) encouraged, aided, and abetted Ms. Gilchrist's false testimony, (ii) coached, directed, and encouraged Ms. Gilchrist to provide investigative reports consistent with the district attorney's theory of the case, and (iii) failed to investigate Ms. Gilchrist's practices and ignored evidence that she violated Mr. Pierce's constitutional rights, on the grounds that these claims were all barred by absolute prosecutorial immunity under *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993), and *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976). Mr. Macy, however, was denied qualified immunity on two claims in his individual capacity. The first of these claims charged Mr. Macy with establishing a policy or custom in his office of using false evidence at trial; the second alleged that Mr. Macy acted

45

with deliberate indifference to the risk that his subordinates would introduce false evidence at Mr. Pierce's trial. The district court found that Mr. Pierce had properly stated a violation of constitutional rights, and that such rights were clearly established before 1986, the time of the conduct in question.

In his filings on appeal, Mr. Macy does not challenge any of the district court's legal conclusions. Rather Mr. Macy presents two arguments premised on a fundamental (and surprising) misunderstanding of what is at stake in the motion to dismiss phase of a lawsuit. The first line of argument is simply a general denial of the factual allegations set forth in Plaintiff's complaint. This argument amounts to little more than conclusory statements charging that Plaintiff has failed to offer any proof to support his allegations. The second claim is an attempt to convert the district court's holding that certain of the allegations in Plaintiff's complaint, even if true, fail to state a claim as a matter of law into a factual ruling that the alleged events did not occur. Neither of these contentions is availing. We briefly elaborate.

First, Mr. Macy asserts that Plaintiff has failed to show the facts required to support his allegations. At various points in his brief, Mr. Macy claims that Mr. Pierce has "no proof for [his] claim," Macy Br. 10, "there [is] no evidence showing that Macy or his office" violated Plaintiff's constitutional rights, *id.* at 9, and that Mr. Pierce's "assertion[s] lack[] merit and cannot be supported." *Id.* at 6.

46

Simply put, neither the facts nor the reasonable inferences to be drawn from them are at issue at this stage of the litigation. *See Ramirez*, 222 F.3d at 1240. Rather, in reviewing a motion to dismiss we accept all Plaintiff's allegations as true and determine only whether these allegations state a claim recognized at law. *Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). For this reason, Mr. Macy's protestations regarding the lack of evidentiary basis for Plaintiff's claims are to no avail; on a motion to dismiss we evaluate the legal, not the factual, basis of the complaint.

Mr. Macy's second line of argument misconstrues the effect of the district court's grant of Mr. Macy's motion to dismiss several of Mr. Pierce's claims on immunity grounds. Mr. Macy contends that the undismissed claims should have been dismissed because the district court found that he did not engage in the alleged conduct.

Typical of Mr. Macy's argument is:

> Judge Cauthron ruled Macy did not encourage, aid or abet Defendant Gilchrist in giving false testimony. (App. 13, Order of July 18th). Further, Judge Cauthron ruled Macy did not fail to investigate Gilchrist's practices nor did he ignore evidence that she had violated Plaintiff's rights in an attempt to secure his conviction. *Id.* Having so found, it begs the question of what "clearly established law" did Macy violate?

Macy Br. 6.

Similarly:

47

> In the present case, the Court found Macy was not guilty of failure to investigate Gilchrist's practices and there was no proof Macy or his staff encouraged, aided or abetted Gilchrist into giving false testimony. (App. 13, Order of July 18th). It is incongruous to have the District Court declare Macy and his staff did not participate in any manner towards Gilchrist's alleged false testimony yet to hold him and his staff liable for employing false evidence and testimony.

*Id*. at 8.

Mr. Macy's characterizations of the district court's holdings are, at their very best, misleading. Even cursory examination of the district court's opinion reveals that the dismissals were premised solely on grounds of immunity. The district court granted Mr. Macy's motion to dismiss as to claims for aiding and abetting false testimony, coaching and directing the production of false reports, and failure to investigate Ms. Gilchrist's allegedly questionable practices because "they seek to impose liability for prosecutorial actions in obtaining, reviewing and evaluating evidence and witness testimony, all of which are 'intimately associated with the judicial phase of the criminal process.'" Op. 12-13, Macy App. 12-13. (quoting *Imbler*, 424 U.S. at 430). No determination was made (nor could one have been made at this stage of the litigation) as to the factual question of whether Mr. Macy engaged in the alleged conduct.

Mr. Macy's argument thus amounts to an attempt to convert a legal finding of immunity into a factual determination that he did not commit the acts alleged in Plaintiff's complaint. But a court's declaration that the allegations, even if taken

48

as true, do not state a legal cause of action is not at all equivalent to a finding that the alleged behavior did not occur. The district court correctly stayed within the narrow confines of a motion to dismiss and in light of the standards set forth in *Buckley* and *Imbler* granted immunity as a matter of law. This finding had no bearing on the truth of the allegations asserted, and Mr. Macy's contentions to the contrary are unavailing.

## IV. Conclusion

For the foregoing reasons we AFFIRM the district court's denial of Defendant Gilchrist's and Defendant Macy's motions to dismiss.