**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 21, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ABBY TISCARENO; and GUILLERMO
TISCARENO,

     Plaintiffs–Appellees,

v.

RICHARD ANDERSON, in his
individual capacity and official capacity,

     Defendant–Appellant,

LORI FRASIER; MARION WALKER;
and WILLIAM BEERMAN, in their
individual capacities; and
INTERMOUNTAIN HEALTH CARE,
INC., in its individual capacity,

     Defendants.

No. 09-4238

---

**ORDER GRANTING APPELLANT'S MOTION TO CORRECT CERTAIN
ERRORS**

---

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

---

This matter is before the court on the motion of Richard Anderson to correct

certain errors in our original opinion.  The motion is **GRANTED**.  The original opinion

is withdrawn and an amended opinion attached to this order.


Entered for the Court


Carlos Lucero
Circuit Judge

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ABBY TISCARENO; and GUILLERMO
TISCARENO,

      Plaintiffs–Appellees,

v.

RICHARD ANDERSON, in his
individual capacity and official capacity,

      Defendant–Appellant,

LORI FRASIER; MARION WALKER;
and WILLIAM BEERMAN, in their
individual capacities; and
INTERMOUNTAIN HEALTH CARE,
INC., in its individual capacity,

      Defendants.

No. 09-4238

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:07-CV-00336-CW-DN)**

---

J. Clifford Petersen, Assistant Utah Attorney General, Salt Lake City, Utah, (Joni Jones
and Mark Shurtleff with him on the briefs) for the Defendant-Appellant.

Kathryn Collard, Salt Lake City, Utah, (Macon Cowles, Boulder, Colorado, with her on
the briefs) for the Plaintiffs-Appellees.

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

**LUCERO**, Circuit Judge.

Richard Anderson, former director of the Utah Division of Child and Family Services ("DCFS"), appeals the denial of his motion to dismiss this civil rights suit filed by Abby and Guillermo Tiscareno. Tiscareno[1] claims that Anderson was bound to comply with <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and to create policies ensuring that doctors working with DCFS properly revealed exculpatory evidence to prosecutors. Because such an obligation was not clearly established, we conclude that Anderson was entitled to qualified immunity. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand with instructions to dismiss the claims against Anderson.

**I**

This appeal stems from the tragic and debilitating abuse of a one year old child, N.M. Because this appeal comes to us from the denial of a motion to dismiss for failure to state a claim, we recite the facts as Tiscareno pled them.

**A**

Abby Tiscareno ran a licensed day care in Summit County, Utah. On the morning of November 14, 2003, James Molineux dropped off his two sons, including N.M. Tiscareno had been caring for the Molineux boys since September 2003. N.M. appeared

---

[1] Although both Abby and Guillermo Tiscareno are plaintiffs in this action, the pertinent facts all relate to Abby. Thus, we refer to her alone as "Tiscareno."

sleepy that morning, and Tiscareno placed him in a crib.  When Tiscareno attempted to feed the baby from his bottle, he was unable to drink and lost consciousness.  After attempting and failing to revive N.M. by jostling him, Tiscareno called 911.

N.M. was taken to Primary Children's Medical Center ("PCMC") and given a CT scan.  The scan revealed hemorrhaging in N.M.'s brain.  Dr. Marion Walker performed surgery and removed a blood clot.  Following the surgery, he sent a portion of the clot to the pathology department, in part to determine when N.M. had been injured.  The pathology department concluded that the clot suggested "elements of previous as well as acute hemorrhage," indicating a "prior bleed."

Another PCMC employee, Dr. Lori Frasier, examined the CT scan, conducted a physical examination of N.M., and interviewed N.M.'s father.  Dr. Frasier concluded that N.M.'s injury must have occurred the morning of November 14, while he was in Tiscareno's care.  Dr. Frasier's conclusion accorded with Dr. Walker's observation from surgery that the bleeding in N.M.'s brain was fresh, suggesting a very recent injury.  Shortly thereafter, Dr. Frasier became privy to the pathology report that would have undermined her and Dr. Walker's conclusion.

On November 17, Dr. Frasier spoke with one of the detectives investigating N.M.'s injuries.  She told the detective that N.M. had been shaken and that his injuries could only have occurred while he was in Tiscareno's care.  Tiscareno consistently denied that she had injured N.M., but Dr. Frasier's insistence that the injuries were recent led the police to focus exclusively on Tiscareno.  Tiscareno was arrested and charged with felony child abuse.

Tiscareno requested any evidence pertaining to her case. Throughout Tiscareno's prosecution, one portion of N.M.'s medical records was kept at PCMC's main repository and another portion was kept at PCMC's Center for Safe and Healthy Families, consistent with the hospital's practice with respect to records of child abuse victims. Dr. Frasier, Dr. Walker, and hospital administrators received requests from the prosecutor for medical records but did not produce the pathology report.

DCFS, led by Anderson, also received a request from the prosecutor to produce N.M.'s records. The agency had an office at PCMC and frequently worked with the hospital in its investigations into potential child abuse. In Tiscareno's case, DCFS relied upon Dr. Frasier's conclusions in determining that N.M. was abused by Tiscareno. Rather than seeking out N.M.'s medical records, DCFS relied on PCMC to respond to the prosecutor's requests. Tiscareno did not receive the pathology report prior to her trial.

Tiscareno was tried and convicted based in large part on the expert testimony of Dr. Frasier and Dr. Walker. On the stand, Dr. Walker disclosed for the first time the existence of a pathology report. The jury never saw the report, nor heard any testimony regarding its contents except for Walker's testimony that it was unremarkable.

It was not until the Molineuxs sued Tiscareno that Tiscareno received the exculpatory pathology report. She sought a new criminal trial based on the new evidence and on erroneous jury instructions. A Utah court granted Tiscareno a new trial based on the erroneous jury instructions. When confronted with the pathology report at the second trial, Dr. Frasier admitted that it suggested earlier bleeding in N.M.'s brain. Dr. Walker admitted that the report was consistent with a subdural hematoma, suggesting an injury

sustained days before N.M. lost consciousness.  Tiscareno was found not guilty after a bench trial.

**B**

Tiscareno filed a suit for damages under § 1983 and under state law against Anderson and several individuals and entities[2] involved in the investigation and prosecution.  She claimed that Anderson violated her right to due process under Utah and federal law.  Anderson moved to dismiss based on qualified immunity and immunity under the Utah Governmental Immunity Act ("UGIA"), Utah Code §§ 63G-7-101, et seq. The district court rejected both arguments.  Anderson appeals both aspects of the district court's ruling.  He contends that the district court erred in denying him qualified immunity and that Tiscareno's state claim is barred because she failed to file a notice of claim, as required by the UGIA.

**II**

We have jurisdiction to review a denial of qualified immunity because such an order "falls within 'that small class [of orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review. . . .'"  Mitchell v. Forsyth, 472 U.S. 511, 524 (1985) (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)).  We also "have subject matter jurisdiction to hear appeals of orders denying motions to dismiss where the motions are based on [state law] immunity from suit."  Aspen Orthopaedics & Sports Med., LLC v. Aspen

---

[2] We emphasize that this appeal is limited to defendant Anderson.  We draw no conclusions regarding the conduct of the other defendants.

Valley Hosp., 353 F.3d 832, 837 (2003).  The critical question in determining if interlocutory review based on state immunity is appropriate is whether state law confers "a right not to stand trial."  Decker v. IHC Hosp., Inc., 982 F.2d 433, 436 (10th Cir. 1992).  In response to our certified question, the Utah Supreme Court indicated that the UGIA implicitly grants immunity from suit, not merely immunity from liability, to employees of Utah.  Mecham v. Frazier, 193 P.3d 630, 633 (Utah 2008).

We review de novo a district court's denial of a motion to dismiss based on immunity from suit.  Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008).  In determining whether a plaintiff has "state[d] a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), we accept allegations of fact as true and draw reasonable inferences in favor of the plaintiff.  Gann, 519 F.3d at 1092.  The complaint must "state a claim to relief that is plausible on its face"; in other words, there must be "more than a sheer possibility that the defendant has acted unlawfully."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotation omitted).

### III

"Qualified immunity protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Weise v. Casper, 593 F.3d 1163, 1166 (10th Cir. 2010) (quotations omitted).  The doctrine "is designed to protect public officials who act in good faith, on the basis of reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms."  Pierce v. Gilchrist, 359 F.3d 1279, 1299

(10th Cir. 2004).   We look to the law as it was established at the time the alleged violation took place.  See id. at 1297.  We need not engage in a "scavenger hunt" for a case with identical facts, but rather determine whether the official had "fair notice that the described conduct was unconstitutional."  Id. at 1298.  We may, within our discretion, resolve the "clearly established" issue without reaching the constitutional violation question.  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

Tiscareno contends, and the district court agreed, that Smith v. Secretary of New Mexico Department of Corrections, 50 F.3d 801 (10th Cir. 1995), and Utah's child abuse reporting statute, Utah Code § 62A-4a-402(1)(b), put Anderson on notice that DCFS had a duty to comply with Brady.  However, neither the Brady case law nor Utah's statute supports this conclusion.  Although a child service agency or official may be liable for Brady violations under some circumstances, those circumstances were not present with respect to Anderson.  Anderson did not have a clearly established obligation to create procedures to ensure that DCFS and the doctors with whom the agency worked unearthed and revealed exculpatory evidence.

### A

A criminal defendant or, as in this case, a former criminal defendant, may establish a Brady violation of her due process rights by showing:  "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the accused; and (3) that the evidence was material."  Smith, 50 F.3d at 824 (quotation omitted).  In Smith, we held that the "prosecution" includes "not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, as well as the law enforcement

personnel and other arms of the state involved in investigative aspects of a particular criminal venture." 50 F.3d at 824 (citation omitted).

Smith's rule requires a fact-based inquiry into the criminal investigation at issue. In examining the scope of the Brady duty, we noted "[t]he duty to produce requested evidence falls on the state; there is no suggestion in Brady that different arms of the government are severable entities . . . . The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney." Id. at 824 n.35 (quotation omitted). Citing Fero v. Kerby, 39 F.3d 1462, 1472 n.12 (10th Cir. 1994), we stated that it is "irrelevant" whether the police rather than the prosecutor failed to produce the exculpatory evidence. Smith, 50 F.3d at 825 (quotation omitted).

**1**

Smith stands for the proposition that the prosecutor must turn over exculpatory evidence gathered by cooperating investigative agencies and personnel. Id. at 824-25. This holding has been confirmed by the Supreme Court, which determined that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 438-39 (1995). Whether the prosecutor has acted in good faith or bad faith is thus irrelevant to the Brady inquiry. Id. at 437-38.

However, Smith does not provide precise boundaries for the term "prosecution." Smith, 50 F.3d at 824. Although the case concludes that Brady is a limitation on the state as a whole, id. at 824 n.35, it limits the actual scope of Brady duties to the prosecution, including all "arms of the state involved in investigative aspects of a particular criminal

venture," id. at 824. Determining whether an agent of the government is sufficiently involved in a "particular criminal venture" is a fact-based inquiry which defies broad generalizations. Because the two police departments cooperated in the murder investigation at issue in Smith, both departments were part of the team for that particular investigation. Id. at 824; cf. Perez v. United States, 502 F. Supp. 2d 301, 309 n.8 (N.D.N.Y. 2006) (holding that the Immigration and Naturalization Service was "[a]n arm of the prosecution" only because it was a government agency that "investigates and provides information specifically aimed at prosecuting a particular accused" (quotation omitted and emphasis added)).

Beyond police officers, we have extended Brady obligations to other personnel in the police department who are actively involved in a particular investigation. See, e.g., Pierce, 359 F.3d at 1281, 1299 (subjecting a forensic examiner who deliberately fabricated evidence to liability based on Brady and related cases). Other circuits have held that other government agencies, cooperating on a particular investigation, are part of the prosecution in cases of Brady or discovery violations. See United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995) (Food and Drug Administration deemed "one" with the prosecution when it conducted the investigation per statute and cooperated with prosecution in the investigation at issue); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973) (Department of Justice charged with constructive possession of Post Office personnel files) overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir.1984); Perez, 502 F. Supp. 2d at 309 n.8; cf. United States v. Ramierez, 174 F.3d 584, 588 (5th Cir. 1999) (material in possession of a Bureau of Prisons employee who

"initiated and was constantly involved in" the investigation was in constructive possession of the United States under the Jencks Act).

We have never addressed the question of whether someone like Anderson, the head of a child services agency, is subject to Brady duties. Courts examining somewhat similar situations have generally refused to deem social workers or child services agencies subject to Brady's requirements. See Lavalee v. Coplan, 374 F.3d 41, 44-45 (1st Cir. 2004) (the child services agency at issue was "neither the police nor the equivalent of the police in assisting the prosecution"); Turbe v. Gov't of the V.I., No. 2005-34, 2009 U.S. Dist. LEXIS 69888, *40-41 (D.V.I. Aug. 6, 2009) (unpublished) (finding no Brady violation because "there [was] no indication that the prosecution and the [social services agency] engaged in a joint investigation or otherwise shared labor and resources"). Similarly, on plain error review, we refused to impute to the prosecution knowledge of evidence possessed by the Oklahoma Insurance Department because "nothing in the record . . . indicate[d] that the U.S. Attorney's Office and the OID had a working relationship close enough" to justify such an attribution. United States v. Redcorn, 538 F.3d 727, 744 (10th Cir. 2008).

Thus, the central inquiry in determining whether an individual or agency is part of the prosecution is how closely the person or agency worked with the prosecutor's office on a particular investigation. Smith, 50 F.3d at 824; cf. Redcorn, 538 F.3d at 744.

**2**

Another question left unaddressed in Smith is whether and to what extent Brady violations by investigators create liability under § 1983. Although this court and most

other circuit courts have denied qualified immunity to investigators for blatant <u>Brady</u> violations, Tiscareno has not cited a case in which we imputed knowledge to an investigator, as opposed to the prosecutor's office itself, of <u>Brady</u> material and held the investigator liable for damages on that basis.

It is clear that the knowing and intentional failure of an investigator to turn over exculpatory evidence creates liability. We held this much in <u>Pierce</u>, 359 F.3d at 1299. In that case we held that <u>Brady</u> and related cases put a forensic scientist working for a police department on notice that "deliberate or reckless falsification or omission of evidence was a constitutional violation." <u>Id.</u> We accordingly denied qualified immunity. <u>Id.</u> at 1300.

Nearly all of our sister circuits have also determined that police may be liable under § 1983 for failure to turn over <u>Brady</u> evidence.[3] In many of these cases, however,

---

[3] <u>See</u> <u>Moldowan v. City of Warren</u>, 578 F.3d 351, 378 (6th Cir. 2009) (determining that it is clearly established law that the police have a <u>Brady</u> duty); <u>Tennison v. City & Cnty. of San Francisco</u>, 570 F.3d 1078, 1087 (9th Cir. 2009) (<u>Brady</u> duty applies and police officers may be held liable); <u>Yarris v. Cnty. of Del.</u>, 465 F.3d 129, 141 (3d Cir. 2006) ("[P]olice officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor." (quotation omitted)); <u>Wilson v. Lawrence Cnty.</u>, 260 F.3d 946, 957 (8th Cir. 2001) (police have a responsibility to follow "the <u>Brady</u> line of cases" and are liable under § 1983 insofar as they are reckless in doing so); <u>Brady v. Dill</u>, 187 F.3d 104, 114 (1st Cir. 1999) (noting that a police officer may be found liable if he "fails to apprise the prosecutor or a judicial officer of known exculpatory information"); <u>McMillian v. Johnson</u>, 88 F.3d 1554, 1569 (11th Cir. 1996) (it was "clearly established that an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence"); <u>Walker v. City of New York</u>, 974 F.2d 293, 299 (2d Cir. 1992) ("[P]olice satisfy their obligations under Brady when they turn exculpatory evidence over to the prosecutors."); <u>Geter v. Fortenberry</u>, 882 F.2d 167, 170 (5th Cir. 1989) ("A police officer cannot avail himself of a qualified immunity defense if he . . . deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles." (quotation and

the circuit courts have held or suggested that there must be some level of culpability to subject an investigator to liability for damages; in other words, unlike a prosecutor who may be imputed with knowledge of exculpatory evidence regardless of his good intentions, an investigator facing a § 1983 suit is liable only for information that he knew or should have known and failed to disclose to the prosecutor. See Wilson, 260 F.3d at 957; Dill, 187 F.3d at 114; McMillian, 88 F.3d at 1569; Geter, 882 F.2d at 170; Jones, 856 F.2d at 995.

Although in a criminal prosecution, intent of the prosecutor and the investigative team is irrelevant, in a § 1983 context, all that is clearly established is that an investigator must not knowingly or recklessly cause a Brady violation.

**B**

Turning to the facts of this case, we must determine if Tiscareno has alleged facts sufficient to show that Anderson violated any clearly established principle. Even a generous reading of the case law fails to establish clearly that Anderson's actions amounted to a constitutional deprivation. Several factors distinguishing this case from our past precedent make this apparent.

First, Tiscareno does not allege that Anderson or DCFS actually participated in the investigation. Cf. Smith, 50 F.3d at 824. In cases in which courts have held investigative

---

alteration omitted)); Jones v. City of Chicago, 856 F.2d 985, 995 (7th Cir. 1988) (deliberate concealment of exculpatory evidence violates Brady and subjects police officers to liability). But see Mowbray v. Cameron Cnty., 274 F.3d 269, 278 (5th Cir. 2001) (finding "no case extending Brady to police officers or lab technicians"); Jean v. Collins, 221 F.3d 656, 660 (4th Cir. 2000) ("[T]o speak of the duty binding police officers as a Brady duty is simply incorrect.").

agents and agencies are subject to <u>Brady</u>, the agent or agency has been involved in the "particular" investigation. <u>Smith</u>, 50 F.3d at 825, n.36; <u>see also</u> <u>Perez</u>, 502 F. Supp. 2d at 309 n.8. But Tiscareno alleges that Anderson is liable for <u>failing</u> to investigate and for improperly delegating DCFS's investigative responsibility to the doctors with whom DCFS worked. Further, Tiscareno does not allege that Anderson acted recklessly or in bad faith. <u>See</u> <u>Pierce</u>, 359 F.3d at 1299. Absent a specific reckless or intentional act on Anderson's part to withhold exculpatory evidence from the prosecutor and thus the defendant, we may not conclude that he violated clearly established law.

Second, Tiscareno contends that Utah law creates an affirmative duty under <u>Brady</u>. She relies on Utah Stat. § 62A-4a-403, which requires DCFS to report and investigate cases of child abuse. This argument is unavailing. Although, a statute may suggest a close relationship with the prosecutor's office, <u>see, e.g.</u>, <u>Wood</u>, 57 F.3d at 737, nothing in our case law holds that a state statute alone can create a <u>Brady</u> obligation, the breach of which subjects the investigator to liability. Tiscareno argues that the reporting statute, in light of <u>Smith</u>, makes it "reasonable to impute knowledge" of the pathology report to the prosecution. But whether such imputation is reasonable is beside the point in this § 1983 action.

Finally, we are not persuaded by Tiscareno's argument that DCFS, and by proxy, Anderson, is responsible for the acts of PCMC doctors which may have resulted in a due process deprivation. Tiscareno alleges that DCFS improperly delegated its duty, pursuant to Utah Stat. § 62A-4a-403 (1)(b), to investigate child abuse. In another context, we concluded that DCFS may rely on doctors' conclusions in its investigations, even when

-13-

such investigations result in civil child welfare proceedings. <u>P.J. v. Wagner</u>, 603 F.3d 1182, 1188, 1200-01 (10th Cir. 2010). DCFS is therefore not vicariously liable for any failure of PCMC or its individual employees to reveal the pathology report. And, although Tiscareno alleges a pattern or practice of failing to train or supervise DCFS doctors to comply with <u>Brady</u>, neither the Utah reporting statute nor any other authority supports such an obligation to train.

Anderson is entitled to qualified immunity because he acted reasonably in light of clearly established law. It was not clearly established at any time during the investigation of N.M.'s abuse that a child services agency, under state reporting requirements, had a duty pursuant to <u>Brady</u> to unearth, or train others to reveal, exculpatory evidence.

**IV**

With respect to Tiscareno's Utah claim, Anderson contends that it is barred by the notice of claim provision of the UGIA. Utah Stat. § 63G-7-401(2). Tiscareno argues that her suit falls into an exception to the UGIA, acknowledged by the Utah Court of Appeals, which allows a suit to proceed without a notice of claim under a "self-executing" provision of the Utah Constitution. <u>Heughs Land, L.L.C. v. Holladay City</u>, 113 P.3d 1024, 1026 (Utah App. 2005) (allowing a suit for damages without any notice of claim "under article I, section 22 of the Utah Constitution, which provides that '[p]rivate property shall not be taken or damaged for public use without just compensation'"). The Supreme Court of Utah held that the due process clause of the Utah Constitution, like the takings clause, is self-executing. <u>Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.</u>, 16 P.3d 533, 536 (Utah 2000).

However, in <u>Spackman</u>, the court also recognized that the takings clause is the only provision of the Utah Constitution which expressly provides damages as a remedy. <u>Id.</u> at 537. <u>Spackman</u> held damages to be an appropriate remedy for a constitutional violation if: (1) "a plaintiff [can] establish that he or she suffered a 'flagrant' violation" meaning "a defendant must have violated 'clearly established' constitutional rights"; (2) "a plaintiff [can] establish that existing remedies do not redress his or her injuries"; and (3) "a plaintiff [can] establish that equitable relief, such as an injunction" is inadequate. <u>Id.</u> at 537-38. <u>Spackman</u> does not clearly address whether a suit for damages, even if it passes this test, may be brought without a notice of claim. But we need not reach this secondary question because, in any case, Tiscareno has failed to show she is entitled to damages under Utah law.

The first prong of the <u>Spackman</u> test is essentially identical to the "clearly established" prong of the qualified immunity inquiry. It requires the violation of a clearly established constitutional right "'of which a reasonable person would have known.'" <u>Id.</u> at 537 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Tiscareno cites no additional authority from Utah law to support her argument that Anderson's conduct violated her right to due process. Applying our analysis in Part III, <u>supra</u>, we conclude that Tiscareno has failed to show a "flagrant" violation and therefore may not seek damages without complying with the UGIA's notice of claim requirement.

**V**

We **REVERSE** the denial of Anderson's motion to dismiss and **REMAND** to the district court for proceedings consistent with this opinion. We **DENY** the motion of the University of Utah to file an amicus brief.