FILED
United States Court of Appeals
Tenth Circuit

February 23, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ABBY TISCARENO; GILLERMO
TISCARENO,

     Plaintiffs - Appellees,

v.

LORI FRASIER, in her individual
capacity,

     Defendant - Appellant,

and

WILLIAM BEERMAN, in his
individual capacity; RICHARD
ANDERSON, in his individual
capacity and official capacity;
DAVID BRICKEY, in his
individual capacity;
INTERMOUNTAIN HEALTH
CARE, INC., in its individual
capacity,

     Defendants.

No. 13-4156
(D.C.No. 2:07-CV-00336-CW-DBP)
(D. Utah)

ABBY TISCARENO; GUILLERMO
TISCARENO,

     Plaintiffs - Appellees,

v.

IHC HEALTH SERVICES,

      Defendant - Appellant,

and

LORI FRASIER, in her individual capacity; WILLIAM BEERMAN, in his individual capacity,

      Defendants.

13-4161
(D.C.No. 2:07-CV-00336-CW-DBP)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **KELLY** and **BACHARACH**, Circuit Judges.

---

In November 2003, a child (N.M.) experienced a severe brain injury that left him permanently disabled. Ms. Abby Tiscareno, N.M.'s daycare provider at the time, was blamed for this injury and prosecuted for child abuse. But after two trials, Ms. Tiscareno was acquitted.

Ms. Tiscareno and her husband, Mr. Gillermo Tiscareno, have invoked 42 U.S.C. § 1983 against two of the defendants, Dr. Laurie Frasier and IHC Health Services, Inc. The Tiscarenos claim that Dr. Frasier and

---

[*]     This order and judgment does not constitute binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But, the order and judgment may be cited for its persuasive value under Fed. R. App. P. 32.1(a) and 10th Cir. R. 32.1(A).

IHC failed to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and that Dr. Frasier maliciously prosecuted Ms. Tiscareno.

Dr. Frasier and IHC moved for summary judgment based in part on qualified immunity. The district court denied this motion, and Dr. Frasier and IHC seek interlocutory review of the denial of qualified immunity. We conclude that Dr. Frasier and IHC are entitled to qualified immunity because the summary judgment evidence does not reflect the violation of a clearly established constitutional right. Based on these conclusions, we reverse the denial of summary judgment.

Under the malicious prosecution theory against Dr. Frasier, the Tiscarenos must prove the absence of probable cause. And, even under the Tiscarenos' version of the facts, there was probable cause tying Ms. Tiscareno to N.M.'s injury. Thus, the malicious prosecution theory fails as a matter of law.

The same is true of the *Brady* claim. Ms. Tiscareno was acquitted, not convicted, and IHC lacked any notice that *Brady* would be applied to a private hospital (whether or not it had a state contract). As a result, a fact-finder could not reasonably infer the violation of a clearly established constitutional right under *Brady*.

## I.     N.M.'s Brain Injury and Medical Efforts to Find the Cause

The suit grew out of Ms. Tiscareno's daycare work. Through that work, Ms. Tiscareno took care of N.M., a one-year-old boy in seemingly

3

good health. Hours after his drop-off at daycare, N.M. was unresponsive in his crib and Ms. Tiscareno called for an ambulance.

N.M. was taken to a private hospital operated by IHC. At the hospital, doctors saw N.M. displaying symptoms consistent with a brain injury. As medical personnel tried to determine the cause, they began to suspect that Ms. Tiscareno had abused the child. These suspicions culminated in her arrest and prosecution.

## A. The CT Scan

Doctors ordered a computed tomography (CT) scan of N.M.'s head. The results showed a massive hematoma (collection of blood) between N.M.'s brain and his skull. Some of the bleeding was new; other bleeding was old. Thus, doctors could not tell from the CT scan whether the injury was old or new.

## B. Dr. Walker's Observations During Surgery

Whatever the cause, Dr. Marion Walker (a neurosurgeon) concluded that N.M. needed emergency surgery to stop the bleeding. During surgery, Dr. Walker did not observe any evidence of prior bleeding. Instead, Dr. Walker observed only "freshly clotted blood" resulting from several torn arteries. Joint App. at 743. Based on his observations, Dr. Walker concluded in an affidavit that N.M. had been violently shaken and thrown down on a soft surface.

4

### C. Pathology Report

During surgery, Dr. Walker removed a sample of the clotted blood and had it sent to the hospital's pathology department. Dr. Theodore Pysher, a pathologist, concluded that the sample contained traces of hemosiderin (an iron deposit left behind when the body re-absorbs blood). To Dr. Pysher, the presence of hemosiderin suggested that N.M.'s brain had bled on a prior occasion.

In his surgical report, Dr. Walker did not state that he had sent the blood clot to pathology. And, for unknown reasons, the pathology report was not properly filed with N.M.'s other medical records.

### D. Eye Examination

After N.M.'s surgery, Dr. Scott Larson (an ophthalmologist) examined N.M.'s eyes and saw thousands of retinal hemorrhages. In Dr. Larson's opinion, the retinal hemorrhages were consistent with "non-accidental head trauma, shaking or impact." *Id.* at 5216-17.

### E. Dr. Frasier's Report

N.M.'s treating doctors suspected abuse, prompting administrators to contact Dr. Laurie Frasier, a pediatrician whose job involved the assessment of medical information in cases of suspected abuse. Dr. Frasier examined N.M., reviewed the CT scan and medical records, and spoke with Dr. Walker and N.M.'s father. Dr. Frasier concluded that N.M. "ha[d] been subjected to abusive head injury" due to violent shaking "with

5

possible impact." *Id.* at 139. Dr. Frasier added that the injury had likely taken place after the boy's drop-off at daycare:

> [N.M.] would not have been normal for any period of time after the event . . . . A reasonable caregiver would have known immediately that [N.M.] was experiencing severe symptoms . . . . If he was normal . . . when he was dropped off (even if he was a little bit sleepy) this would not be consistent with a severe head injury before or at the time that he was left with the babysitter.

*Id.*

In reaching her assessment, Dr. Frasier did not consider the results of Dr. Pysher's pathology report, which showed prior bleeding in N.M.'s brain.

## F.     Arrest of Ms. Tiscareno

Ms. Tiscareno was arrested for child abuse based on

- N.M.'s arrival at daycare in seemingly good health without visible signs of injury,

- Ms. Tiscareno's status as the only adult with N.M. between his arrival at daycare and the absence of any other person capable of causing the injuries,

- consistency of the head injury with abusive trauma,

- Dr. Frasier's conclusion that N.M. had likely been injured after arriving at daycare,

- small scratch marks on N.M.'s chest, and

- Ms. Tiscareno's admission that she had shaken N.M. (although she had claimed the shaking was an attempt to save N.M.'s life).

6

*Id.* at 3174-78.

### G.    First Trial

Ms. Tiscareno went to trial on felony and misdemeanor charges of child abuse.  Ms. Tiscareno's defense was that N.M. had an old injury that created a hematoma and re-bled.  Ms. Tiscareno's counsel relied primarily on the results of the CT scan showing evidence of past bleeding.  Though the pathology report also showed past bleeding, the hospital had not furnished that report to the prosecution or the defense.  Thus, Ms. Tiscareno's attorney was unable to utilize the pathology report during trial.

The jury found Ms. Tiscareno guilty of felony child abuse.  Before the trial court entered a judgment of conviction, Ms. Tiscareno moved to arrest the judgment based on erroneous jury instructions.  After filing that motion, Ms. Tiscareno became aware of the pathology report and obtained the report from the hospital.  With the pathology report, Ms. Tiscareno filed a second motion for a new trial.  That motion was based on her discovery of the pathology report.

The trial court granted the motion to arrest the judgment and granted Ms. Tiscareno a new trial based on erroneous jury instructions.[1]  Relying on this ground, the court did not address the second motion (which involved the pathology report).

---

[1]    The court also concluded that the absence of an objection was not fatal because defense counsel was ineffective.

7

## H.    Second Trial

Ms. Tiscareno was given a new trial.  She again defended on the ground that N.M.'s injuries had resulted from a preexisting hematoma that suddenly re-bled.  But, by the second trial, Ms. Tiscareno had obtained the pathology report.  Thus, in the second trial, Ms. Tiscareno was able to utilize this report to show past bleeding.  The court ultimately found Ms. Tiscareno not guilty and entered a judgment of acquittal.

## II.    Denial of Summary Judgment Based on Qualified Immunity

In the subsequent action, the defendants moved for summary judgment based in part on qualified immunity.  The district court rejected the defendants' arguments, concluding that genuine issues of material fact remained.

## III.    Jurisdiction

The Tiscarenos argue that we lack jurisdiction because the defendants ask us to second-guess the district court's factual-sufficiency determinations.  We disagree.

As the Tiscarenos state, we cannot second-guess the district court's determinations on factual sufficiency.  *See Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001).  But, we can review the narrow legal question before us:  Do the facts accepted by the district court show the violation of a clearly established constitutional right?  *See Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013).

8

In conducting this limited review, we analyze the facts in a light favorable to the Tiscarenos. *Medina*, 252 F.3d at 1128. In doing so, we will not question the district court's factual findings unless they are clearly contradicted by the record. *Lewis v. Tripp*, 604 F.3d 1221, 1225-26 (10th Cir. 2010).

## IV. Qualified Immunity

Dr. Frasier and IHC argue that there is no evidence they violated a clearly established constitutional right.

### A. Malicious Prosecution (Dr. Frasier)

On the malicious prosecution claim against Dr. Frasier, the plaintiffs must show the absence of probable cause for Ms. Tiscareno's arrest or continued prosecution. *See Wilkins v. Reyes*, 528 F.3d 790, 799 (10th Cir. 2008). We conclude that there was probable cause at every stage of the prosecution; thus, Dr. Frasier cannot incur liability for malicious prosecution.

Probable cause exists when the facts and circumstances show a "substantial probability that a crime has been committed and that a specific individual committed the crime." *St. John v. Justmann*, 771 F.2d 445, 448 (10th Cir. 1985). Probable cause "must be evaluated as of the events in question." *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004). Thus, an eventual acquittal does not (in itself) show a lack of probable cause. *Id.*

9

Based on the evidence presented on summary judgment, we conclude that there was probable cause to support the charges of child abuse. The evidence shows that

- N.M. was in Ms. Tiscareno's sole care when bleeding began in the brain, which N.M.'s treating doctors attributed to violent shaking,

- the injury was so severe that N.M. would have shown immediate signs of injury, but he had been in seemingly good health upon his arrival at daycare,[2] and

- Ms. Tiscareno told police that she had shaken N.M. in an attempt to revive him.

Together, the evidence creates probable cause to believe Ms. Tiscareno committed child abuse. *See Kerns v. Bader*, 663 F.3d 1173, 1180, 1188-90 (10th Cir. 2011) (concluding that officers had probable cause to arrest even though the prosecutor ultimately dismissed the charges).

According to the Tiscarenos, police and prosecutors based their assessment of probable cause on Dr. Frasier's "fabricated" medical opinions and without the benefit of the pathology report, which showed evidence of prior bleeding in N.M.'s brain. We disagree because probable cause would have existed even without the allegedly fabricated opinions and with the pathology report.

---

[2] At least one other physician had told Detective Leatham that "the symptoms would like [sic] have manifested shortly after the infliction of the injury." Joint App. at 5259.

10

When false information has been allegedly included in a probable cause analysis, we review for probable cause without that information. *Id.* at 1188. Applying this standard, we conclude that probable cause would have existed even without Dr. Frasier's disputed opinions.

The Tiscarenos also assert that the pathology report would have precluded probable cause. We disagree. Even with the report, probable cause would have remained.

When correct information has been excluded from a probable cause analysis, we review for probable cause as if that information had been included. *Id.*

As discussed above, the pathology report shows that a blood clot in N.M.'s brain contained an iron deposit left behind when the body had re-absorbed blood. The iron deposit shows that N.M.'s brain had bled on a prior occasion. To the Tiscarenos, this evidence indicates that

- N.M.'s brain injury resulted from a preexisting hematoma that re-bled, and

- someone other than Ms. Tiscareno could have caused the hematoma.

But, even if the pathology report supported the plaintiffs' theory, there was other proof that Ms. Tiscareno had shaken N.M.

This proof consisted of observations during surgery by Dr. Walker, analysis of the bleeding by the physician that wrote the pathology report,

11

and opinions by two ophthalmologists regarding the existence and significance of the retinal hemorrhages.

Dr. Walker, N.M.'s neurosurgeon, attributed the injury to violent shaking and observed no evidence of a preexisting hematoma. When asked about the traces of hemosiderin in N.M.'s brain, Dr. Walker opined that it would be normal to find traces of hemosiderin in the brain of a child who is learning to walk. Dr. Walker added: "It doesn't take much to get a little bit of old blood. I think it happens to everyone." Joint App. at 922.

Dr. Pysher, the author of the pathology report, emphasized that Dr. Walker's observations "would be key to understanding what was present on the child's brain in the form of old versus new blood." *Id.* at 5613. Dr. Pysher also noted that there was "much more" evidence of fresh blood in the clot sample than the "microscopic" traces of older bleeding. *Id.*

Two ophthalmologists also concluded that the injury had resulted from shaking. Dr. Larson, who examined N.M. at the hospital, noted "thousands" of retinal hemorrhages, which he concluded were consistent with "non-accidental head trauma, shaking or impact." *Id.* at 5216. Dr. Alex Levin, who studied N.M.'s medical file, concluded that the retinal hemorrhages were likely caused by shaking and discounted the idea that the damage could have been caused by a re-bleeding hematoma.

With the testimony by these four physicians, probable cause would have remained even with the pathology report's additional evidence of past bleeding. Thus, a reasonable trier of fact could not have found malicious prosecution even with the Tiscarenos' version of the facts. *See V.S. v. Muhammad*, 595 F.3d 426, 428-29, 432 (2d Cir. 2010).[3] As a result, Dr. Frasier is entitled to qualified immunity on this claim.[4]

---

[3] The Second Circuit Court of Appeals addressed a similar issue in *V.S. v. Muhammad*, 595 F.3d 426 (2d Cir. 2010). There, an infant (V.S.) suffered a fractured femur and skull and retinal hemorrhages (diagnosed as a shaken baby syndrome). *V.S.*, 595 F.3d at 428. A state agency attributed the injuries to abuse by the mother, obtained temporary removal of the infant, and proceeded with child abuse charges. *Id.* at 428-29. Before the court rendered a decision, however, the agency withdrew all allegations against the mother. *Id.* at 429. She sued, claiming a constitutional violation through malicious prosecution. *Id.*

The agency requested summary judgment. *Id.* at 429. The district court held that a ruling on qualified immunity should await further discovery. *Id.* at 430. The Second Circuit Court of Appeals reversed, holding that the agency was entitled to summary judgment based on qualified immunity. *Id.* at 431. The court reasoned that the agency could reasonably rely on the diagnosis of shaken baby syndrome by two physicians who had based their diagnoses on retinal hemorrhages, a common indicator of shaken baby syndrome. *Id.* at 431. Doing so, the court discounted the fact that the agency had failed to disclose to the family court that V.S.'s mother had custody of the infant during much of the relevant period. *Id.* Similarly, the court held that the agency was entitled to qualified immunity even though one of the agency's supervisors had failed to disclose to the family court that one of the physicians had said she no longer believed that the mother had injured the infant. *Id.* at 429.

[4] Dr. Frasier also argues that she has absolute immunity. We need not address Dr. Frasier's assertion of absolute immunity because we conclude that she is entitled to qualified immunity.

13

**B.** *Brady* **Claim (Dr. Frasier and IHC)**

The plaintiffs also claim that Dr. Frasier and IHC withheld the pathology report in violation of the right to a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963). There the Supreme Court held that government agents cannot withhold material exculpatory evidence upon request by a defendant. *Brady*, 373 U.S. at 87.

Dr. Frasier and IHC present different arguments on the *Brady* claim. Dr. Frasier argues that Ms. Tiscareno was not deprived of a fair trial because she was not convicted, and IHC argues that it had no clearly established duty to locate and disclose potentially exculpatory evidence. We agree with both arguments; thus, Dr. Frasier and IHC are entitled to qualified immunity.

**1.    Absence of a Conviction (Dr. Frasier)**

Dr. Frasier argues that Ms. Tiscareno was not deprived of any rights under *Brady* because there was no conviction. In support, Dr. Frasier cites *Morgan v. Gertz*, 166 F.3d 1307 (10th Cir. 1999). We agree that Ms. Tiscareno was not deprived of a fair trial absent a conviction.

14

The Tiscarenos argue that we cannot consider this argument because Dr. Frasier failed to include the issue in her answer or motion for summary judgment.[5]

The Tiscarenos' reliance on Dr. Frasier's answer is misguided. Dr. Frasier is relying on the absence of a conviction as a basis for qualified immunity, and she did plead qualified immunity in the answer. Appellees' Supp. App., vol. I, at 112.

Dr. Frasier's omission of this argument in her summary judgment motion would ordinarily preclude appellate review. *See Fairchild v. Workman*, 579 F.3d 1134, 1144 (10th Cir. 2009) ("[W]e ordinarily do not decide issues raised for the first time one appeal."). But, we may consider new arguments when they involve a matter of law and the proper resolution is certain. *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 931 (10th Cir. 2006). Dr. Frasier's new argument on appeal meets these criteria: The argument involves a pure matter of law, and its resolution is certain.

In *Morgan v. Gertz*, we held that in the absence of a conviction, a defendant "cannot be said to have been deprived of the right to a fair trial." 166 F.3d 1307, 1310 (10th Cir. 1999); *see also Livers v. Schenck*, 700 F.3d 340, 359 (8th Cir. 2012) (stating that a *Brady* claim requires a

_____

[5]     The Tiscarenos point out that Dr. Frasier violated 10th Cir. R. 28.2(C)(2) by failing to cite where this issue had been raised and decided in district court.

15

conviction); *Flores v. Satz*, 137 F.3d 1275, 1278-79 (11th Cir. 1998) (same); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) (same).

The Tiscarenos have invoked *Brady* based on allegations that Dr. Frasier withheld exculpatory evidence and fabricated evidence. But, as discussed above, Ms. Tiscareno was not convicted.

The plaintiffs point out that Ms. Tiscareno was found guilty in the first trial. Although the jury found guilt, the trial court never entered a judgment of conviction. And, "[a] conviction is effective only upon entry of judgment by the trial court." *Morgan*, 166 F.3d at 1310.[6] Thus, even with the finding of guilt, Ms. Tiscareno was never convicted of a crime.

Because Ms. Tiscareno was not convicted of a crime, *Brady* does not apply. As a result, Dr. Frasier is entitled to qualified immunity on the *Brady* claim.

## 2. Clearly Established Obligation (IHC)

IHC argues that it had no clearly established constitutional obligation to locate and disclose the pathology report. We agree. The Tiscarenos

---

[6] In *Morgan*, the jury rendered a guilty verdict, but the trial court entered a judgment of acquittal. 166 F.3d at 1308-10. Though the jury found the defendant guilty, we held that the claimant could not recover for a *Brady* violation because there was never a judgment of conviction: "The only judgment the court entered was a judgment of acquittal. Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial." *Id.* at 1310.

16

have not identified any authority that would have imposed such an obligation.[7]

For purposes of qualified immunity, a constitutional right is "clearly established" if the law at the time of the defendant's conduct would have provided "'fair warning'" to the defendant. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). For IHC, we ask if a private hospital under contract with the state would have had fair warning of an independent constitutional duty to locate and disclose medical evidence. No such warning would have been evident at the time.

A private hospital like IHC could have expected the *prosecution* to bear an obligation to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). And, the private hospital could have anticipated extension of this obligation to law enforcement officials and state agencies investigating crimes. *See, e.g.*, *Pierce*, 359 F.3d at 1281, 1298 (holding that a forensic chemist with the police department incurred liability under § 1983 for withholding exculpatory evidence and fabricating evidence); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995) (explaining, while reviewing a habeas petition, that "the 'prosecution' for *Brady* purposes encompasses not only

---

[7]     IHC also argues that it is not a state actor and that we have pendent appellate jurisdiction to address this argument. We need not decide whether IHC is a state actor because it has qualified immunity.

17

the individual prosecutor handling the case, but also extends to . . . other arms of the state involved in investigative aspects of a particular criminal venture").[8] But, as of the time of the first trial (October 2004), neither the Supreme Court nor our court had extended *Brady* to private hospitals under contract with the state.

The Tiscarenos argue that IHC had a clearly established *Brady* obligation based on our opinions in *Pierce v. Gilchrist* and *Smith v. Sec'y of N.M. Dep't of Corr.* Their reliance on these opinions is misplaced.

In *Pierce*, we held that a forensic chemist employed by a police department would have had fair warning that falsifying or withholding evidence would violate a defendant's right to a fair trial. 359 F.3d at 1299-1300. The case concerned the obligation of an individual working with the police in the investigation, not a hospital's obligation to assist in an investigation related to its primary function of providing healthcare. *Pierce* would not have given IHC fair warning that it had a *Brady* obligation.

In *Smith*, we stated that *Brady* obligations can extend to certain "arms of the state" involved in an investigation. *Smith*, 50 F.3d at 824 n.35. But, as of the time of the first trial, neither the Supreme Court nor

---

[8] Although the Tiscarenos argue that Dr. Frasier could qualify as an arm of the state investigating crimes, we need not consider this argument. As discussed above, Dr. Frasier has elsewhere established that she is eligible for qualified immunity because Ms. Tiscareno was never convicted.

18

our court had treated private hospitals as an "arm of the state" for purposes of *Brady*.

Because a private hospital had no clearly established obligation to locate and disclose exculpatory evidence, IHC is entitled to qualified immunity on the *Brady* claim.

## V.     Conclusion

Dr. Frasier and IHC are entitled to qualified immunity. As a result, we reverse the district court's denial of their summary judgment motions and remand with instructions to grant these motions based on qualified immunity.

Entered for the Court


Robert E. Bacharach
Circuit Judge

19

13-4156, <u>Tiscareno v. Frasier</u>; 13-4161, <u>Tiscareno v. IHC Health Services</u>

**BRISCOE**, Chief Judge, concurring.

I agree with the majority that Ms. Tiscareno cannot succeed in her pursuit of a <u>Brady</u> claim against Dr. Frasier because her criminal trial did not result in a judgment of conviction. In <u>Morgan v. Gertz</u>, 166 F.3d 1307 (10th Cir. 1999), we held that "the withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of evidence, the criminal defendant is denied a fair trial." <u>Id.</u> at 1310. However, "[r]egardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial." <u>Id.</u> Here, because the only judgment entered by the court in Ms. Tiscareno's case was a judgment of acquittal, Ms. Tiscareno has not been deprived of her right to a fair trial. As a result, her <u>Brady</u> claim fails. Although this argument was not raised by Dr. Frasier before the district court, it presents a purely a legal issue that we can resolve on undisputed facts. Our failure to reach this issue would, in my view, result in manifest injustice by permitting a baseless claim to proceed. Allowing this <u>Brady</u> claim to proceed would also result in a further waste of judicial resources and undermine the spirit of qualified immunity. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 237 (2009) ("Qualified immunity is an immunity from suit rather than a mere defense to liability." (internal quotations omitted)).

Contrary to the majority, however, I would not rely on IHC's argument that it had no clearly established duty to locate and disclose potentially exculpatory evidence to grant IHC qualified immunity. As I understand Ms. Tiscareno's argument, she asserts

that because Dr. Frasier participated in the investigation of this case on behalf of IHC, IHC had a responsibility under Brady to locate and disclose the pathology report. But the district court concluded that there was a factual dispute as to whether Dr. Frasier was acting as an agent of IHC under the state contract and as to whether Dr. Frasier was sufficiently involved in the investigation to be considered part of the prosecution. Rather than wade into that factual morass, I would assume for purposes of IHC's qualified immunity motion that Dr. Frasier was working on behalf of IHC and then conclude that because Dr. Frasier is entitled to qualified immunity, so too is IHC as regards Ms. Tiscareno's argument that IHC's liability arises from Dr. Frasier's actions. Without a Brady violation, Ms. Tiscareno "cannot be said to have been deprived of [her] right to a fair trial," Morgan v. Gertz, 166 F.3d at 1310; and in the absence of a constitutional violation by Dr. Frasier, IHC cannot be held liable under § 1983. See Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1264 (10th Cir. 2008); Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216-17 (10th Cir. 2003); Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317-18 (10th Cir. 2002); see also Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006).

However, IHC did not actually argue that it cannot be held liable because no constitutional violation occurred, only Dr. Frasier argued that. Generally, this failing would preclude us from relying on this argument. Richison v. Ernest Group, Inc., 634 F.3d 1123, 1131 (10th Cir. 2011) (Where a party "fail[s] to argue for plain error" on appeal, that "marks the end of the road for an argument for reversal not first presented to

2

the district court."). But if the premise of Ms. Tiscareno's argument is that IHC is liable because Dr. Frasier was acting on IHC's behalf, then I think an argument can be made that because Dr. Frasier raised this argument (and Ms. Tiscareno had the opportunity to respond to it), we can apply the same analysis to IHC's appeal. And given that we know Ms. Tiscareno's <u>Brady</u> claim fails as a matter of law, the claim against IHC should also fail. See <u>Singleton v. Wulff</u>, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals," and "[c]ertainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, . . . or where injustice might otherwise result." (internal quotations and citations omitted)); <u>Sussman v. Patterson</u>, 108 F.3d 1206, 1210 (10th Cir. 1997) ("'[W]e may depart from [the general waiver rule] in our discretion, particularly when we are presented with a strictly legal question, the proper resolution of which is beyond doubt or when manifest injustice would otherwise result.'" (quoting <u>Daigle v. Shell Oil Co.</u>, 972 F.2d 1527, 1539 (10th Cir. 1992))).

While I rely on a different rationale to address IHC's appeal, I concur in the result reached by the majority in both appeals.